# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

| | |
|---|---|
| United States of America, *ex rel* | ) CASE NO.  98-3021-CIV-SEITZ |
| Deborah Louise Christensen, | ) |
| Benjamin Clark, | ) |
| Jimmy Peter Cassis, | ) **FILED IN CAMERA AND UNDER SEAL** |
| Dulce Maria Bustamante, | ) |
| Reba E. Shoenfelt, | ) FIRST AMENDED COMPLAINT FOR |
| Carlese Abrielle  D'Andrea, and | ) DAMAGES AND OTHER RELIEF UNDER |
| James Robert Connolly | ) THE FALSE CLAIMS ACT |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| Preferred Healthcare Consultants, Inc. | ) |
| Compass Health Systems, P.A. | ) |
| Behavioral Healthcare Corporation, | ) |
| Behavioral Healthcare Corporation of | ) |
| Delaware, | ) |
| BHC Fort Lauderdale Hospital, Inc. d/b/a | ) |
|     Fort Lauderdale Hospital, | ) |
| Fort Lauderdale Hospital Management, | ) |
| LLC., d/b/a Fort Lauderdale Hospital | ) |
| Edward Stack, | ) |
| Carol Caldwell, | ) |
| Neil Curry, | ) |
| William Nolan, | ) |
| Rachel St. John, | ) |
| Michael Davis, | ) |
| Michael Gerber, | ) |
| Donna Putnam, | ) |
| Nicole Nicastro, | ) |
| Preferred Healthcare Consultants, Inc., | ) |
| DOE I d/b/a "Interphase", | ) |
| Barry Goldstein, | ) |
| Jonathan Huttner, | ) |
| Samuel Konnell, | ) |
| DOE II d/b/a "Sandalfoot," | ) |
| DOE III d/b/a "Continued Care, Inc.," | ) |
| Changing Times, Inc. d/b/a "The Cove", | ) |
| DOE IV d/b/a "Changing Times", | ) |
| 1ˢᵗ Step Management Team, Inc., | ) |
| Daniel S. Young, III, | ) |
| Foundation, Inc. | ) |
| The Retreat, | ) |
| Westchester Healthcare Network, | ) |
| Westchester General Hospital, Inc., | ) |
| Westchester General Hospital, Inc. | ) |
|     d/b/a  Southern Winds Hospital, | ) |
| Compass Health Systems, P.A. | ) |
| Dr. Richard Seely, | ) |
| Dr. Sohail Punjwani, and | ) |
| Does 1-100 | ) |
| Defendants | |

Unsealed _____



34/8

First Amended *Qui Tam* Complaint Pursuant To The False Claims Act
**(Jury Trial Demanded)**
**Jurisdiction and Venue**

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims presented by defendants under the Federal Medicare, Tricare (including its predecessor program, "CHAMPUS"), Federal Employee Health Benefit Program ("FEHBP"), and Indian Health Services ("IHC") programs and  Federal contribution to the state Medicaid program.  (These programs are hereinafter collectively referred to as the "Federal Programs").  The action arises under the provisions of 31 U.S.C. §3729, et. seq.

2.      Section 3729(a) of the Act provides that "Any action under section 3730 may be brought in any judicial district in which any Defendant may be found to reside, or transact business, or in any district in which any proscribed act has occurred."  Defendants   transact business within this judicial district.

3.      Under the Act, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on the Defendant until the Court so orders.  The Government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence and information.

**Parties to the Action**

4.      Relators DEBBIE LOUISE CHRISTENSEN, BENJAMIN CLARK, REBA E. SHOENFELT,  JIMMY PETER CASSIS, CARLESE D'ANDREA, DULCE MARIA BUSTAMANTE, and JAMES CONNOLLY, are current employees or former employees of Behavioral Healthcare Corporation who collectively possess approximately 26 ½  years experience working at BHC's Fort Lauderdale Hospital and approximately 66 years of

2

1  collective work experience in mental health.  (DEBBIE CHRISTENSEN, BENJAMIN CLARK,

2  REBA E. SHOENFELT, JIMMY CASIS, CARLESE D'ANDREA, DULCE MARIA

3  BUSTAMANTE, and JAMES CONNOLLY hereinafter collectively referred to as "Relators".)

4

5       5.    As required under the Act, Relators have  furnished to the Attorney General of the

6  United States and to the United States Attorney for the Southern  District of Florida

7  simultaneous with or prior to the filing of this Complaint, a statement of all material evidence

8  and information related to the Complaint.  This disclosure statement supports the existence of

9  overcharges and false claims by the Defendants.

10

11       6.    Relator DEBBIE CHRISTENSEN is a citizen of the United States and a resident

12  of the State of Florida.   In 1970, the State of Pennsylvania licensed Ms. CHRITENSEN as a

13  Registered Nurse.  In 1981, the State of Florida also licensed Ms. CHRISTENSEN as a

14  Registered Nurse and in 1987 further certified Ms. CHRISTENSEN as a Psychiatric Nurse.   In

15  1984,  Relator CHRISTENSEN  began *per diem* employment at Fort Lauderdale Hospital, as a

16  Head Nurse in the hospital's Adolescent Unit.  In 1988, FORT LAUDERDALE HOSPITAL

17  hired CHRISTENSEN as a full time employee.   Beginning on or about September, 1991, and

18  continuing until on or about January, 1998, Fort Lauderdale Hospital employed Ms.

19  CHRISTENSEN as Charge Nurse/Relief Supervisor in the Rapid Stabilization Unit ("RSU").

20  Beginning on or about January, 1998, until on or about  February, 1998,  Fort Lauderdale

21  Hospital employed Relator CHRISTENSEN as a Charge Nurse in its Substance Abuse Unit.

22  On or about February, 1998, until on or about March, 1998, Relator CHRISTENSEN served as

23  supervisor on the 3 pm to 11 pm shift and assisted in admitting and receiving.  On or about

24  March, 1998, Relator CHRISTENSEN began serving as intake coordinator in Fort Lauderdale

25  Hospital's Admitting and Receiving Department, the position in which she served until

26  defendants BHC and FORT LAUDERDALE HOSPITAL illegally terminated her employment

27  on or about September 12, 1998 for blowing the whistle on the fraud outlined in this complaint.

28     Because of Relator's observations of BHC's admission and rejections of patients, Relator

1    CHRISTENSEN had frequent contact with employees of other mental health programs and

2    facilities especially with regard to the appropriateness of patient admissions and the control of

3    patient referrals, admissions, and discharges by Defendants PREFFERRED HEALTHCARE

4    CONSULTANTS, INC., SAMUEL KONNELL, JONATHAN HUTTNER, and their affiliates.

5    Relator discovered that defendants were engaging in false and fraudulent conduct.  Christen was

6    then fired for reporting that conduct to corporate management.

7

8        7.    Beginning on or about January 1997,  FORT LAUDERDALE HOSPITAL

9    employed Relator BENJAMIN CLARK as intake coordinator, the position in which he

10   served until BHC and FORT LAUDERDALE HOSPITAL discharged Relator CLARK on or

11   about September 24, 1998.   Relator CLARK is a citizen of the United States and a resident of

12   the State of Florida. Because of Relator's observations of BHC's admission and rejections of

13   patients, Relator CLARK had frequent contact with employees of other mental health programs

14   and facilities especially with regard to the appropriateness of patient admissions and the control

15   of patient referrals, admissions, and discharges by Defendants PREFFERRED HEALTHCARE

16   CONSULTANTS, INC., SAMUEL KONNELL, JONATHAN HUTNER, and their affiliates.

17   Relator CLARK discovered that defendants were engaging in false and fraudulent conduct and

18   objected to the fraud on numerous occasions to management of FORT LAUDERDALE

19   HOSPITAL and BHC.  Clark was fired as a result.

20

21       8.    Relator DULCE MARIA BUSTAMANTE began employment with

22   Community Psychiatric Corporation's CPC Pineville Hospital (a suburb of Charlotte, N.C.) in

23   1994. In 1995, CPC transferred Relator BUSTAMANTE to FORT LAUDERDALE

24   HOSPITAL where she began employment as the Assessment and Referral Coordinator.  On or

25   about February, 1998, FORT LAUDERDALE HOSPITAL transferred Relator BUSTAMANTE

26   to its Utilization Review Department, the position which she currently serves FORT

27   LAUDERDALE HOSPITAL.  Ms. BUSTAMANTE received her Bachelors in Clinical

28   Psychology from the Universidad Rafael Urdaneta in 1987, and her Masters in Arts (Clinical

4

1   Psychology) from the University of North Carolina - Charlotte in 1994.  Relator

2   BUSTAMANTE is a citizen of Venezuela and a resident of the State of Florida.  Relator

3   BUSTAMANTE observed that defendants were engaging in false and fraudulent conduct and

4   objected on numerous occasions to management of FORT LAUDERDALE HOSPITAL. As a

5   result, she was retaliated against and denied promotions.

6

7       9.     Relator JIMMY CASIS is a Registered Nurse.  On or about October 12, 1992,

8   Relator CASSIS  began employment at FORT LAUDERDALE HOSPITAL  as a Charge Nurse

9   in the Adolescent Unit during the evening shift.  On or about June 1, 1993, FORT

10  LAUDERDALE HOSPITAL promoted Relator CASSIS to Nurse Manager of the PHP

11  Program.  On or about March 1, 1998, FORT LAUDERDALE HOSPITAL promoted Relator

12  CASSIS to Assistant Director of Nursing.  On or about March 23, 1998, FORT LAUDERDALE

13  HOSPITAL promoted CASSIS to  Acting Director of Nursing.  Relator frequently  observed

14  BHC's  patients, treatments, therapies, and services for patients housed in BHC's FORT

15  LAUDERDALE HOSPITAL. Relator CASSIS  discovered that defendants were engaging in

16  false and fraudulent conduct and objected on numerous occasions to management of FORT

17  LAUDERDALE HOSPITAL and BHC.   CASSIS was fired as a result.  Relator CASSIS is a

18  citizen of Canada and Portugal  and a resident of the United States

19

20      10.    Relator REBA SHOENFELT (hereinafter, "SHOENFELT") is Registered Nurse

21  since 1996.   On or about May 18, 1998, Relator SHOENFELT  began employment at Fort

22  Lauderdale Hospital, as a nurse in the Partial Hospitalization Program ("PHP"), the position in

23  which SHOENFELT served until she resigned /was constructively discharged from her

24  employment on or about September 4, 1998, due to defendants'  Medicare fraud.  Relator

25  SHOENFELT is a citizen of the United States and a resident of the State of Florida.    Relator

26  SHOENFELT  frequently  observed  BHC's patients, treatments, therapies, and services for

27  patients admitted to FORT LAUDERDALE HOSPITAL's PHP Unit, and therefore, discovered

28  that Defendants were engaging in false and fraudulent conduct.  Relator SHOENFELT resigned

1   from employment at FORT LAUDERDALE HOSPITAL on September 4, 1998 due to

2   Medicare fraud.

3

4       11.    Relator CARLESE ABRIELLE D'ANDREA (hereinafter, "D'ANDREA") is

5   a Registered Nurse licensed by the State of Florida in 1994 and received her Certification in

6   Psychiatric Mental Health in 1997.   In 1982, the State of Illinois issued Relator D'ANDREA

7   her License in Practical Nursing.   On or about February 26, 1998,  Relator D'ANDREA  began

8   employment at FORT LAUDERDALE HOSPITAL,   as Nurse Manager for the Forensic Unit.

9   Relator D'ANDREA possesses approximately four years work experience in mental health.

10  Relator D'ANDREA is a citizen of the United States and a resident of the State of Florida.

11  Relator frequently  observed  FORT LAUDERDALE HOSPITAL's  patients, treatments,

12  therapies, and services for patients housed in FORT LAUDERDALE HOSPITAL's Forensic

13  Unit,  Relator D'ANDREA   discovered that Defendants were engaging in false and fraudulent

14  conduct.    Relator D'ANDREA  discovered that defendants were engaging in false and

15  fraudulent conduct and objected on numerous occasions to management of FORT

16  LAUDERDALE HOSPITAL (Donna Putnam) and BHC (Carol Caldwell).

17

18      12.    Relator JAMES ROBERT CONNOLLY (hereinafter, "CONNOLLY")  began

19  employment at Fort Lauderdale Hospital, on or  about September, 1996, as a Mental Health

20  Technician, the position in which he served until Fort Lauderdale Hospital and/or BHC

21  permanently "laid off" Relator CONNOLLY on or about October 9, 1998. Relator

22  CONNOLLY worked often on the Rapid Stabilization Unit ("RSU"), Adult Long Term Unit

23  ("ALT"), Geriatric Unit, Adult Psychiatric Unit, and, beginning in March, 1998, working on the

24  day shift in the Forensic Unit.   Relator CONNOLLY frequently  observed  BHC's patients,

25  treatments, therapies, and services for patients housed in BHC's Forensic  Unit,  and, therefore,

26  discovered that Defendants were engaging in false and fraudulent conduct.    Relator is a citizen

27  of the United States and a resident of the State of Florida and has worked in mental health since

28  on or about March, 1989. Connolly was "laid off"/terminated because of his knowledge of the

1   fraud and because he opposed it.

2

3                              <u>DEFENDANTS</u>

4

5       13A.   Defendant BEHAVIORAL HEALTHCARE CORPORATION, a Delaware

6   corporation,  is a privately held corporation which maintains its headquarters in Nashville,

7   Tennessee.  This defendant also conducts business under the name "BEHAVIORAL

8   HEALTHCARE CORPORATION", a name which is not registered with the Florida Secretary

9   of State, Division of Corporations.  (This Defendant along with defendant BEHAVIORAL

10  HEALTHCARE CORPORATION OF DELAWARE are hereinafter referred to as "BHC").

11  On or about October, 1996, defendant BHC acquired Community Psychiatric Corporation

12  (hereinafter "COMMUNITY PSYCHIATRIC"), a nation wide operator of psychiatric facilities.

13  Relators estimate that Defendant BHC owns, controls, and operates approximately 43

14  psychiatric facilities nationwide.

15      13B.  Relators are informed and believe and based thereon allege that Defendant

16  BEHAVIORAL HEALTHCARE CORPORATION OF DELAWARE, is a tradename, alias,

17  alter ego or subsidiary of Defendant BEHAVIORAL HEALTHCARE CORPORATION.

18  (Defendants BEHAVIORAL HEALTHCARE CORPORATION and BEHAVIORAL

19  HEALTHCARE CORPORATION OF DELAWARE are hereinafter collectively referred to as

20  "BHC".)

21      14.   On or about October, 1996, BHC acquired Fort Lauderdale Hospital through a

22  merger with  COMMUNITY PSYCHIATRIC.    Relators are informed and believe and based

23  thereon allege that BHC owns and controls Defendant BHC FORT LAUDERDALE

24  HOSPITAL d/b/a FORT  LAUDERDALE HOSPITAL.  (This Defendant is hereinafter referred

25  to as "FORT LAUDERDALE HOSPITAL".)  FORT LAUDERDALE HOSPITAL owns and

26  operates an eighty (80) bed facility located at 1601 East Los Olas Blvd.  in Fort Lauderdale,

27  Broward County, Florida.

28

                                        7

15.  Relators are informed and believe and based thereon allege that  Defendant EDWARD STACK is a Director of Defendant BHC and, furthermore, is a major or the controlling shareholder of Defendant BHC. (This individual defendant is hereinafter referred to as "STACK".)

16.  At all times relevant until on or about November 19, 1998,  Defendant NEIL CURRY  is a Regional Vice President of Defendant BHC whose territory includes, inter alia, Defendnt FORT LAUDERDALE HOSPITAL.  On or about November 19, 1998, BHC demoted CURRY to administrator of FORT LAUDERDALE HOSPITAL.   (This individual defendant is hereinafter referred to as "CURRY".)

17.  Defendant WILLIAM NOLAN  is an officer, employee, or agent of Defendant BHC.  Relators are informed and believe and based thereon allege that Defendant NOLAN is BHC  corporate officer in charge of  compliance. (This individual defendant is hereinafter referred to as "NOLAN").

18.  Defendant CAROL CALDWELL  is an officer, employee, or agent of Defendant BHC.  Relators are informed and believe that Defendant CALDWELL is Vice President  of Clinical Services  of Defendant  BHC. (This individual defendant is hereinafter referred to as "CALDWELL").

19.  Defendant RACHEL ST. JOHN  is an officer, employee, or agent of Defendant BHC.  Beginning on or about August 1, 1998, until on or about September 30, 1998, Defendant ST. JOHN, was present at FORT LAUDERDALE HOSPITAL. (This individual defendant is hereinafter referred to as "ST. JOHN").

20.   Defendant MICHAEL DAVIS is an officer, employee, or agent of Defendant BHC.  (This individual defendant is hereinafter referred to as "DAVIS").  Relators are informed

1   and believe and based thereon allege that, DAVIS was, at all relevant times, Senior Vice

2   President/Chief Financial Officer of Defendant BHC.

3

4       21.   Defendant MICHAEL GERBER  became Administrator of Fort Lauderdale

5   Hospital on or about March, 1998, and continued to serve as such until on or about November

6   19, 1998.  (This individual defendant is hereinafter referred to as "GERBER").

7

8       22.   Defendant DONNA PUTNAM  became Director of the PHP Program  at FORT

9   LAUDERDALE HOSPITAL  on or about March 16, 1998, and approximately one week

10  thereafter, became Director of the Forensic Unit.  (This individual defendant is hereinafter

11  referred to as "PUTNAM").    Relators are informed and believe and based thereon allege that,

12  on or about March,  1998,  Defendant PUTNAM began employment (on the payroll) for

13  Defendant PREFERRED HEALTHCARE CONSULTANTS but PUTNAM continues, through

14  the present time, to be an officer, employee, or agent of Defendant BHC and/or FORT

15  LAUDERDALE HOSPITAL.

16

17      23.   Defendant  NICOLE  NICASTRO  became Director  of the Partial Hospitalization

18  Program ("PHP") at  FORT LAUDERDALE HOSPITAL  on or about early April, 1998.  (This

19  individual defendant is hereinafter referred to as "NICASTRO".)  Relators are informed and

20  believe and based thereon allege that, on or about April, 1998,  Defendant NICASTRO began

21  employment (on the payroll) for Defendant PREFERRED HEALTHCARE CONSULTANTS

22  but Defendant NICASTRO continues, through the present time, to be an officer, employee, or

23  agent of Defendants BHC and/or FORT LAUDERDALE HOSPITAL.

24

25      24.   Defendant  DR. RICHARD  SEELY, M.D. is a Psychiatrist licensed to practice

26  medicine in the State of Florida.    DR. SEELY operates a  practice with offices at 555 SW

27  148th Avenue in Sunrise, Broward County, Florida.   (This defendant is hereinafter referred to

28  as "DR. SEELY".)  Beginning on or about March 18, 1998, and continuing until late August,

1  1998, DR SEELY was the attending physician for all or almost all of the patients referred to

2  FORT LAUDERDALE HOSPITAL  by defendants HUTTNER, KONNELL, GOLDSTEIN,

3  PHCI, INTERPHASE, and/or CONTINUED CARE.

4

5      25.  Defendant DR. SOHAIL PUNJWANI, M.D.  is a Psychiatrist  licensed to practice

6  medicine in the State of Florida.      (This defendant is hereinafter referred to as "DR.

7  PUNJWANI".)  DR. PUNJWANI directed the admission of and/or was the attending physcian

8  for many of the patients at issue in this action.   Furthermore, on or about September, 1998,

9  FORT LAUDERDALE HOSPITAL promoted DR. PUNJWANI to Medical Director.  DR.

10  PUNJWANI began attending to patients at FORT LAUDERDALE HOSPITAL on or about

11  1996.   Beginning on or about late August, 1998, and continuing through the present time, DR.

12  PUNJWANI  was the attending physician for all or almost all of the patients referred by

13  defendants HUTTNER, KONNELL, GOLDSTEIN, PHCI, INTERPHASE, and/or

14  CONTINUED CARE.  DR. PUNJWANI is a resident of the State of  Florida.

15

16      26.  COMPASS HEALTH SYSTEMS, P.A.  is a Florida  corporation which maintains

17  its principal offices at 1065 on 125 th Street in North  Miami, Dade County, Florida.  Relators

18  are informed and believe and based thereon allege that Defendant, DR. PUNJWANI  is an

19  employee, officer, and/or shareholder of defendant COMPASS HEALTH SYSTEMS, INC.

20  (This corporate defendant is hereinafter referred to as "COMPASS".)  (Doctors SEELY,

21  PUNJWANI, and SEGAL  and their partners and agents whose identities are still unknown to

22  Relators are hereinafter collectively referred to as the "STAFF PHYSICIANS".)

23

24      27.   Defendant  PREFERRED HEALTHCARE CONSULTANTS, INC.  is a Florida

25  Corporation which maintains its principal offices in Biscayne Park, Dade  County, Florida.

26  (This corporate defendant is hereinafter referred to as "PHCI").  Relators are informed and

27  believe that defendants HUTTNER and GOLDSTEIN often use business names other than

28  PREFERRED HEALTHCARE CONSULTANTS interchangeably when referring to their

1 │ organization.   The entity referred to as "INTERPHASE" is a prominent example.

2

3 │      28.   Relators are informed and believe and based thereon allege that defendant

4 │ JONATHAN HUTTNER is President of corporate defendant PHCI.   JONATHAN HUTTNER

5 │ is also the Chief Executive Officer of defendant INTERPHASE.   Relators are informed and

6 │ believe and based thereon allege that HUTTNER is also an officer, employee, agent, or alter ego

7 │ of defendants INTERPHASE and CONTINUED CARE.  (This individual defendant is

8 │ hereinafter referred to as "HUTTNER").   Relators are informed and believe and based thereon

9 │ allege that defendant HUTTNER is an agent, nominee or proxy for defendant BARRY

10 │ GOLDSTEIN.   Relators are further informed and believe and based thereon allege, that

11 │ defendant HUTTNER is an agent for defendant BHC and/or FORT LAUDERDALE

12 │ HOSPITAL

13

14 │      29.   Relators are informed and believe and based thereon allege that, at all relevant

15 │ times, a person referred to as BARRY GOLDSTEIN is an officer or owner of, or exercised *de*

16 │ *facto* control over corporate defendants PHCI, CONTINUED CARE,  and/or INTERPHASE

17 │ and individual defendants  HUTTNER and/or KONNELL.   Relators are informed and believe

18 │ that GOLDSTEIN is also an officer, employee, agent, or alter ego of defendant INTERPHASE.

19 │ (This Doe defendant is hereinafter referred to as "GOLDSTEIN".)

20

21 │      30.   Defendant SAMUEL KONNELL is an officer, employee or agent (i.e.,  Court

22 │ Liason and Forensic Program Director)  of BHC's Fort Lauderdale Hospital beginning on or

23 │ about March, 1998, and continuing through the present time.   Mr. KONNELL is also the Court

24 │ Liason and Forensic Program Director for WESTCHESTER GENERAL HOSPITAL and

25 │ SOUTHERN WINDS HOSPITAL both doing business as WESTCHESTER HEALTHCARE

26 │ NETWORK.  (This individual defendant is hereinafter referred to as "KONNELL".)  Mr.

27 │ KONNELL is also an officer, employee, and/or agent of INTERPHASE, PHCI, and/or

28 │ CONTINUED CARE, INC.

1        31 .   Relators are informed and believe and based thereon allege that Defendants

2  HUTTNER, GOLDSTEIN, and KONNELL and persons whose identity is known to the

3  defendants but who are currently unidentified, transact business under the name "Interphase", an

4  unregistered fictitious name.   (This entity and the person(s) who own, operate, are members

5  of it, and/or control it are hereinafter referred to as "INTERPHASE" or, alternatively DOE I).

6  Defendant INTERPHASE purports to be "A Network of Treatment Programs for the Dually

7  Diagnosed". Relators are informed and believe and based thereon allege that the so-called

8  "members" of this "Network of Treatment Programs" include the following psychological

9  facilities: FORT LAUDERDALE HOSPITAL, WESTCHESTER GENERAL HOSPITAL,

10  SOUTHERN WINDS HOSPITAL, and THE RETREAT and, additionally, includes numerous

11  residential group living facilities including, CHANGING TIMES, THE COVE,  1st STEP

12  MANAGEMENT TEAM, FOUNDATIONS.  Relators are informed and believe and based

13  thereon allege that the following programs are also owners, agents, or nominees for defendant

14  INTERPHASE: Phoenix Clinic, Safe Passage Program, Florida Behavioral Health, Efaro

15  Behavioral Health, Caring Center,  Metro Dade Center, Partners Program, Sandalfoot Program,

16  Utopia Half Way House, as well as additional  programs as yet unidentified by Relators.

17  Relators are informed and believe that  Defendant INTERPHASE maintains its offices at 2514

18  Hollywood Boulevard, Suite 408, in Hollywood, Broward County, Florida.

19

20        32.  Relators are informed and believe and therefore allege that individual defendants

21  GOLDSTEIN, KONNELL, HUTTNER, and/or corporate defendants PHCI  and/or

22  INTERPHASE  operate and/or operated businesses known as "SANDALFOOT" and

23  "CONTINUED CARE, INC." as alter egos, parent corporations, agents, or subsidiaries of such

24  defendants.  (These DOE defendants are hereinafter referred to as "SANDALFOOT" and

25  "CONTINUED CARE", respectively.)  Relators are informed and believe and based thereon

26  allege that HUTTNER and/or his affiliates owns, controls, receives or pays compensation for

27  patient referrals to or from the following programs located within this jurisdictional district:

28  Phoenix Clinic,Safe Passage Program, Florida Behavioral Health, Efaro Behavioral Health,

1  Caring Center,  Metro Dade Center, Partners Program, Sandalfoot Program, Utopia Half Way

2  House.

3

4      33.  Defendant CHANGING TIMES, INC. operates a 3/4 Way House program known

5  as "The Cove." (This corporate defendant is hereinafter referred to as "THE COVE.")

6  Defendant THE COVE  maintains its principal offices at 911 Village Boulevard in West Palm

7  Beach or elsewhere (possibly Boca Raton) in Palm Beach County, Florida.  Relators are

8  informed and believe and based thereon allege that Defendants HUNTER, KONNELL,

9  GOLDSTEIN, INTERPHASE,  CONTINUED CARE, INC, and/or PHCI control, operate,

10  and/or own THE COVE or are agents for THE COVE.

11

12      34.  Defendant DOE IV owns and/or operates a 3/4 Way House  program known as

13  "Changing Times" at a facility located at  655 NE 149th St. North Miami, Dade County,

14  Florida.  (This defendant is hereinafter referred to as "CHANGING TIMES".)  Relators are

15  informed and believe and based thereon allege that Defendants HUNTER, KONNELL,

16  GOLDSTEIN, INTERPHASE,  CONTINUED CARE and/or PHCI control, operate, and/or own

17  CHANGING TIMES or are agents for CHANGING TIMES.

18

19      35.  Defendant 1st STEP MANAGEMENT TEAM, INC. is a Florida corporation

20  which owns and operates a 3/4 Way House program known as  FIRST STEP  at a facility

21  located at 508 NE 1st Avenue in Fort Lauderdale, Broward County, Florida.  (This defendant is

22  hereinafter referred to as "FIRST STEP".)  Relators are informed and believe that Defendants

23  HUNTER, KONNELL, GOLDSTEIN, INTERPHASE, CONTINUED CARE, and/or PHCI

24  control, operate, or own FIRST STEP or are agents of FIRST STEP.

25

26      36.  Defendant  Mr. DANIEL S. YOUNG,  III is president of FIRST STEP.  (This

27  individual defendant is hereinafter referred to as "YOUNG".)

28

37.   Defendant FOUNDATIONS, INC., owns and operates a 3/4 Way House known as "The Foundation" located at 999 West Prospect Road, Fort Lauderdale, Broward County, Florida.   (This defendant is hereinafter referred to as "FOUNDATIONS".)

38.   Defendant DOE V owns and operates a psychiatric facility that provides PHP and inpatient programs known as THE RETREAT at a facility located at 555 SW 14th Avenue in Sunrise, Broward County, Florida.   (This defendant is hereinafter referred to as "THE RETREAT".)

39 .   Defendant WESTCHESTER GENERAL HOSPITAL, INC. owns and operates a free standing hospital which includes a psychiatric unit known as SOUTHERN WINDS HOSPITAL.   This facility is located at 2500 S.W. 75 Avenue in Miami, Florida.   (Defendants WESTCHESTER GENERAL HOSPITAL, INC. and SOUTHERN WINDS HOSPITAL are hereinafter collectively referred to as "SOUTHERN WINDS".)

40.   Defendant SOUTHERN WINDS HOSPITAL is an inpatient psychiatric facility located in Miami and Hialeah, Florida.   SOUTHERN WINDS HOSPITAL is a fictitious name registered to defendant WESTCHESTER GENERAL HOSPITAL.   (This defendant, collectively with its corporate owner, defendant WESTCHESTER GENERAL HOSPITAL, is hereinafter referred to as "SOUTHERN WINDS".)

41.   Relators are informed and believe and based thereon allege that Defendant WESTCHESTER HEALTHCARE NETWORK is an unregistered fictitious entity believed to be controlled and/or operated by defendants WESTCHESTER GENERAL HOSPITAL, SOUTHERN WINDS, and/or INTERPHASE for the purpose of procuring patients for SOUTHERN WINDS HOSPITAL. (This "DOE" defendant is hereinafter referred to as "WESTCHESTER HEALTHCARE NETWORK".)   Defendant KONNELL is the "Court Liason" and "Forensic Unit Director" for defendant WESTCHESTER HEALTHCARE

14

NETWORK.

42.     The true names and capacities, whether individual, corporate, associate or otherwise, of defendants Does 1 through 100, inclusive, and each of them, are unknown to Relator who, therefore, sues these Defendants by such fictitious names and will ask leave of court to amend this Complaint when the same shall have been ascertained.  Relator is informed and believes and upon such information and belief alleges that each Defendant designated herein as a Doe is responsible, for the events and happenings referred to herein which caused the submission of false claims to the United States of America, and to the State of Florida.

43.     At all times herein mentioned, each of the Defendants, was an agent, servant or employee of each of the remaining Defendants, and was at all times acting within the purpose or scope of said agency or employment, and was acting with the express or implied knowledge, permission or consent of the remaining Defendants, and each of them.

## PRELIMINARY STATEMENT

44.     Defendants BHC and FORT LAUDERDALE HOSPITAL  provided in-patient and out-patient psychiatric services to the United States Government including, but not limited to, the United States Department of Health and Human Services ("HHS") and its predecessor, the Department of Health, Education and Welfare ("HEW"), through the federal Medicare program, and to the Department of Defense pursuant to the Civilian Health and Medical Program of the Uniformed Services  ("CHAMPUS") program.   Defendants further provided in-patient and out-patient psychiatric services to members of the Seminole Tribe of Florida.

STATUTORY AND REGULATORY FRAMEWORK

Medicare, Medicaid and CHAMPUS Prohibit Reimbursement For Medically
Unnecessary or Unreasonable Services

45.    In 1965 Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the cost of certain hospital services and care.

46.   HHS, through the Health Care Financing Administration ("HCFA") administers the Medicare Program, which is a system of health insurance for the aged and disabled created under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq. Medicare Part A covers the costs incurred by eligible beneficiaries for certain hospital services. (HHS also administers the Indian Health Services Program which was also defrauded by Defendants).  Reimbursement under Medicare Part A for psychiatric hospitals such as FORT LAUDERDALE HOSPITAL, SOUTHERN WINDS, and THE RETREAT  are  accomplished through submission by the hospital of a cost report, which is a claim for payment containing a breakdown of the costs associated with treatment of eligible Medicare beneficiaries.    Defendants DR. SEELY, DR. PUNJWANI,  and  COMPASS   indirectly received funds from Part A through salaries paid by BHC and/or FORT LAUDERDALE HOSPITAL and directly received Medicare Part B funds for "doctor payments" for psychiatric treatments.

47.   Through HCFA, HHS also administers the Medicaid Program, which insures certain groups, including the poor and disabled, and which is funded in part from federal funds and in part from the state where the facility is located.   42 U.S.C. §§ 1396, et seq.; Fl. Stat. §§ 409.901, et seq.    HCFA, in discharging those responsibilities, contracted with private insurance companies, known as intermediaries, to receive, review, and pay appropriate claims for reimbursement for the provision of psychiatric  services to Medicare Program beneficiaries.

48.    Eligible persons age 65 years and over may enroll in Medicare Part B to obtain health insurance benefits in return for payment of monthly premiums in an amount established by HCFA.  Such individuals are known as "beneficiaries" under the program.

49.     Part B of the Medicare Act was pay for home services for Medicare beneficiaries who needed physicians services.

50.     When a beneficiary obtains medical services from a Part B provider the beneficiary may either pay for the service himself or herself, and submit the provider's bills to Medicare for reimbursement ("unassigned claims") or the beneficiary may assign the right to reimbursement to his or her provider, in which case the provider then submits a bill to Medicare and receives the Medicare reimbursement as the beneficiary's assignee ("assigned claims").

51. Only providers who are "participants" may submit assigned claims for payment.

52.     In order to become a Medicare Part B participant provider physicians and others must agree to certain conditions of participation, including, *inter alia*, the following program requirements:

    A.     not to make false statements or misrepresentations of material facts concerning requests for reimbursement, 42 U.S.C. §§ 1320a-7b(a)(1)(2), 1320a-7, 1320a-7a;  42 C.F.R. § 1001.101(a)(1);

    B.     to bill Medicare only for reasonable and necessary services, 42 U.S.C. §1395y(a)(1)(A). Medicare reimbursement is not permitted for unnecessary or unreasonable care and services;

    C.     Moreover, Medicare precludes reimbursement for "custodial care." 42 U.S.C. § 1395y (a) (9);

    D.     to provide economical medical services, and then, only when medically necessary, 42 U.S.C. §13320c-5(a)(1);

E       to assure that such services are not substantially in excess of the needs of  such patients, 42 U.S.C. §13320a-7(b)(6)(B); and

F.       to certify that the service claimed is a medical necessity.  42 U.S.C. §1395n(a)(2)(B).

53.     42 U.S.C. §1395nn(b) prohibits referrals to any entity  with which the physician has a financial relationship, compensation agreement, or from whom the physician receives any form of remuneration.

54.     The Medicaid and SLIAG programs incorporate the afore described prohibitions. *See e.g.*, 42 U.S.C. Section 1396 b.  Many of the afore described prohibitions are also incorporated into the FEHBP via HIPAA, the Health Insurance Portability and Accountability Act, Title II. Public 105-32 (1997).

55.     The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") and its successor, TRICARE, provide medical benefits, including inpatient mental health coverage to dependents of active duty members of the Uniformed Services, as well as retired members and their dependents and dependents of deceased members.  10 U.S.C. §§ 1071, et seq.  (CHAMPUS and TRICARE are hereinafter collectively referred to as "CHAMPUS".)

56.     The Medicare program reimburses only care that is "reasonable and necessary" for the treatment or diagnosis of illness or injury.   42 U.S.C. § 1395y (a) (1) (A).   Medicare reimbursement is not permitted for unnecessary or unreasonable care and services.   Moreover, Medicare precludes reimbursement for "custodial care." 42 U.S.C. § 1395y (a) (9).

57.     The Medicare program also allows payment to inpatient psychiatric hospitals only

for "active treatment" which can reasonably be expected to improve a patient's condition.   For

services in a psychiatric hospital to be designated as "active treatment," they must be: (a)

provided under and individualized treatment of diagnostic plan, (b) reasonably expected to

improve the patient's condition or for the purpose of diagnosis, and (c) supervised and evaluated

by a physician.   Medicare Hospital Manual, HCFA-Pub. 10, § 212.1.

58.    The Medicaid program reimburses only care that is medically necessary and

provided in accordance with state and federal law.   Fl. Stat. § 409.905.   Any payments under

the program must also be consistent with "efficiency, economy and quality of care."   42 U.S.C.

§ 1396a (a)(30a).   Moreover, Medicaid reimbursement is not permitted for unnecessary or

inappropriate care. Fl. Stat.  § 409.913 (5) (a).

59.    CHAMPUS reimburses only necessary and reasonable care and services.   32

C.F.R. §§ 199.4 (b) (1) (iv) and 199.4 (b) (6) (i).   Billing for medically unnecessary and

inappropriate care falls within the CHAMPUS regulatory definitions of fraud (with appropriate

scienter) and abuse.   32 C.F.R. §§ 199.2 (b), 199.9 (b), 199.9 (b) (3) and 199.9 (c) (5).

Moreover, CHAMPUS precludes reimbursement for "custodial care."   32 C.F.R. §§ 199.2 (b)

and 199.6 (b) (4) (v) (B).

60.    A psychiatric hospital must maintain accurate and current medical records as a

condition of participation in the Medicare, Medicaid, and CHAMPUS Programs.   32 C.F.R. §§

199.2 (b), 199.6 (b) (1) (iii) and 199.6 (b) (4) (iv) (D); 42 C.F.R. §§ 482.60 and 482.61; Fl. Stat.

§ 409.907 (3) (b).

61.    The failure to maintain adequate medical records and the falsification of medical

records falls within the CHAMPUS regulatory definitions of fraud (with appropriate scienter)

and abuse. 32 C.F.R. §§ 199.9 (b), 199.9 (b) (5), 199.9 (c), 199.9 (c) (6 -7).

62.     Seeking reimbursement is not permitted under either the Medicare or CHAMPUS program unless adequate documentation exists in the beneficiary's medical file to demonstrate the performance and medical necessity of the services for which reimbursement is claimed by the provider.

63.     The Medicare and CHAMPUS programs require that therapists meet certain eligibility requirements before a hospital may bill for their services.   32 C.F.R. §§ 199.4 (c) (3) (ix) (A), 199.4 (c) (3) (x), 199.6 (c); 42 C.F.R. § 482.56; Medicare Hospital Manual, HCFA Pub. No. 10, §§ 210.8 and 210.9.

64.     Medicaid payments may only be made to entities that comply with state law.   Fl. Stat. § 409.907.

65.   Both CHAMPUS and HHS require that hospitals be accredited by the Joint Commission for the Accreditation of Hospital Organizations ("JCAHO"), which inspects hospitals for accreditation purposes.

**THE CLAIMS**

66.   Defendants BHC and FORT LAUDERDALE HOSPITAL   directly or indirectly submitted a substantial number of  claims totaling  several million dollars  for reimbursement to the  United States Government or its agents for reimbursement for  providing patient care to psychiatric patients pursuant to the federal Medicare and CHAMPUS programs.   The Plaintiffs estimate that the number of  false claims arising from the Defendant STAFF PHYSICIANS probably exceed 1,000 in number. The amount of these overpayments is substantial.   Relators have not yet determined the number of false claims submitted by the remaining defendants but are informed and believe that the amount of the overpayments to those defendants is also substantial.  If the Court finds that the Defendants committed the fraudulent acts described in

1  this Complaint, the Defendants are subject to a statutory civil penalty of between five thousand

2  dollars ($5,000) to ten thousand dollars ($10,000) for *each* false claim submitted and automatic

3  treble damages applied to the amount of the overpayments.

4

5        67.     From a period beginning on or about 1996, until the present time, Defendants

6  BHC and/or FORT LAUDERDALE HOSPITAL  and Defendants STAFF PHYSICIANS

7  received a substantial portion of their funds from the United States Government through

8  provisions of the Federal Medicare and CHAMPUS Programs.  At all relevant times,  the

9  amount of funds received was governed under regulations promulgated  by  the  Health Care

10  Financing Administration (HCFA) and Department of Defense which provided for  payments to

11  psychiatric hospitals for Medicare qualified and CHAMPUS qualified patients, respectively.

12  These payments were based upon diagnoses  made on patients under Defendants' custody and

13  care.

14

15  **INPATIENT SERVICES AT FORT LAUDERDALE HOSPITAL**

16

17        68.  Applicable Federal regulations and statutes provide for payments to psychiatric

18  hospitals, including Defendants BHC and FORT LAUDERDALE  HOSPITAL, based upon

19  inpatient hospital services furnished  while an inpatient of a psychiatric hospital.  Payment for

20  inpatient psychiatric hospital services is to be made only for 'active treatment' which can

21  reasonably be expected to improve the patient's condition.  For services in a psychiatric hospital

22  to be designated as 'active treatment', they must be:  (a) provided under an individual treatment

23  or diagnostic plan, (b) reasonably expected to improve the patient's condition or for the purpose

24  of diagnosis, and (c) supervised and evaluated by a physician.  Similarly, the Federal

25  CHAMPUS program will reimburse the Defendants for inpatient psychiatric services only if the

26  patient is sufficiently <u>acute</u> to require a regular observation such as a fifteen minute watch (i.e.,

27  "Q-15").

28

69.     In summary, a psychiatric hospital is paid a specified base rate for each Medicare and CHAMPUS qualified inpatient it treats.  These funds are paid by the United States Government through its Federal Medicare and CHAMPUS programs.  Whether the psychiatric hospital inpatient is Medicare or CHAMPUS qualified is ostensibly determined by the hospital's diagnosis of the patient.  The  hospital is charged with the responsibility of assigning the correct diagnosis to an inpatient.

70.     The primary diagnosis is determined by the patient's primary physician who documents the principal diagnosis and other "secondary" diagnoses in the physician's Admitting Orders and the Treatment Plan in the patient's medical records.

71.  The diagnosis and admissions documents are supported by entries in the Daily Medical Records which record symptoms purportedly exhibited by the patient and the patient's alleged  progress.  The hospital uses these patient records to justify and support its diagnosis of a condition which is eligible for reimbursement from the Federal Medicare or CHAMPUS programs.

72.  At all relevant times (beginning on or before  November 30, 1992)  and continuing through the time of trial, Defendant FORT LAUDERDALE HOSPITAL,  acting on behalf of Defendant BHC, knowingly  defrauded the United States Government by:

     (a) falsifying patient intake documentation;

     (b) falsifying Physician's Admitting Orders;

     (c)  falsifying Treatment Plans or using non-individualized Treatment Plans;

     (d) falsifying  Daily Medical Records; and

     (e)  falsifying the inpatient claims for reimbursement submitted to the Federal Medicare and CHAMPUS programs.

1   This fraud harmed the Treasury of the United States.  Relators are informed and believe and

2   based thereon allege, numerous fraudulent  claims continue to be submitted to the Federal

3   Medicare and CHAMPUS  programs by Defendants BHC and FORT LAUDERDALE

4   HOPSITAL.   Further, Defendant BHC knew of Defendant FORT LAUDERDALE

5   HOSPITAL's fraudulent activities and failed to report such and both Defendants refused to

6   allow their employees to discontinue such practices or report any or all of these fraudulent acts

7   to proper authorities.

8

9        74.    Defendant FORT LAUDERDALE HOSPITAL, acting on behalf of BHC, and

10   Defendant BHC, through its officers, employees, and agents, ordered certain  employees under

11   their direct supervision to falsify and submit for reimbursement from the Federal Medicare and

12   CHAMPUS programs inpatient claims which:

13

14        (a) contained fraudulent Principal Diagnosis;

15         (b) described treatment which was not actually rendered or was inadequately performed;

16        (c) described treatment, which although actually or partially rendered, could not be

17        reasonably expected to improve the patient's condition or to be rendered for purpose of

18        diagnosis;

19        (d) described treatment which was not provided by licensed therapists; and/or

20        (e) described treatment which was not supervised and evaluated by a physician.

21

22

23        75.  The phrase "at all relevant times" as used in this Complaint, means the period

24   beginning on or about December 5, 1992 (i.e, violations that occurred within 6 years of the

25   filing of this Complaint) unless otherwise specified.

26

27        76. At all relevant times and continuing through the time of trial, Defendant BHC

28   through its officers, employees, and agents  and FORT LAUDERDALE  HOSPITAL, acting on

behalf of Defendant BHC, fraudulently diagnosed and admitted patients by:

(a) embellishing and exaggerating particular patient behavior in order to support a diagnosis of a condition which would qualify the patient's treatment as eligible for reimbursement by the United States;

(b) creating a second, falsified diagnosis after Defendants' utilization review personnel and/or Defendant BHC and/or FORT LAUDERDALE HOSPITAL's officers, employees, or agents determined that the Defendants' initial diagnosis of the patient could not be covered by Medicare;

(c) ordering psychiatric testing for patients who were incapable of participating in the testing process and/or for patients who were known or believed to have non-acute conditions;

(d) admitting patients and/or continuing to treat patients when Defendant observed that the patient could not be reasonably expected to benefit from treatment and/or were otherwise inappropriate;

(e) admitting patients who had conditions which are not treatable by psychiatric services including repeatedly re-admitting patients who the Defendant BHC and FORT LAUDERDALE HOSPITAL diagnosed as having an untreatable condition immediately after the patient's previous discharge and/or who had not benefitted from similar treatment during his/her previous visit   (i.e., Defendants BHC and FORT LAUDERDALE HOSPITAL frequently admitted numerous patients who had untreatable psychiatric conditions and continued to discharge and then readmit such patients);

24

(f) drafting non-individualized care plans to conform to the fraudulent diagnosis rather than to treat the patient's actual condition, and/or failing to accurately describe the treatment rendered;

(g) failing to update care plans;

(h) fraudulently "documenting" treatment not actually rendered or which was perfunctorily and inadequately rendered;

(i) falsifying "documentation" as to patients' behavior or condition;

(j) Administering tranquilizing drugs to mask the symptoms of conditions which are not treatable, such as combativeness of persons with schizophrenia and which could not be expected to significantly alleviate the patient's medical condition;

(k)  failing to satisfy minimum patient care standards;

(l)  routinely falsely documenting improvement in patients' condition and/or behavior  in order to justify  discharging the patient before the patient's length of stay exceeded Medicare coverage (i.e., length of stay) limitations;

(m) altering or falsifying patient's primary diagnosis (for example, fabricating diagnoses for psychiatric conditions (e.g., depression) when, in fact, patient's primary problem was drug abuse, including crack or cocaine);

(n) altering or falsifying patient records to indicate treatment for a fraudulent primary axis diagnosis when, in fact, the medications provided were to treat the patients' so-called secondary diagnosis (e.g., narcotics or crack addiction);

(o) detaining patients for a specified length of stay determined by patient's payment factor (and therefore, deadline to release the patient or return to patient's three quarter way house) rather than patient's actual condition;

(p) failing to provide adequate qualified personnel;

(q) "documenting" group therapy sessions which were not actually conducted or, if conducted, were not conducted by qualified personnel;

(r) documenting levels of acute services, specifically one-to-one observations and fifteen minute watches (i.e. "Q-15's") which were not actually rendered in order to obtain enhanced payments from the Federal Medicare Program or eligibility for reimbursement from the Federal CHAMPUS program for inpatient treatment;

(s) documenting that patients participated in group therapy when such therapy was not provided and/or such patient, although physically present, was unable or unwilling to participate and therefore could not be reasonably expected to benefit from such group therapy;

(t) documenting that patients participated in group therapy sessions which were eligible for payment by the Federal Programs when, in fact, such sessions were ineligible for payment because the groups' size exceeded the maximum allowable size; and

(u) submitting fraudulent attestations with pertinent data to agents of the United States Government for payment.   Defendant BHC, through its officers, agents, and employees, instructs, requires, and assists its employees, agents, and subsidiaries in performing such fraudulent acts and in concealing such acts.

77.   In performing all of these acts set out herein, Defendants BHC and FORT LAUDERDALE HOSPITAL, defrauded the United States Government by fabricating inpatient diagnoses and medical records in order to receive payments from the Federal Medicare and CHAMPUS programs.  The fraud perpetrated by these Defendants consisted of one or more of the following:

(a) the attestations, diagnosis, and reimbursement claims associated with a large number of Medicare inpatients treated by Defendants during the period herein specified were predominantly false and fraudulent (and continue to be false and fraudulent) in that they were submitted in order to fraudulently obtain Federal Medicare payments for psychiatric services which could not reasonably expected to benefit the patients;

(b) the attestations, diagnosis, and reimbursement claims associated with a large number of Medicare and CHAMPUS eligible inpatients who were allegedly treated by Defend-ants during the period herein specified were predominantly false and fraudulent (and continue to be false and fraudulent) in that they were submitted in order to fraudulently obtain Federal Medicare and CHAMPUS payments for psychiatric services which were not actually rendered (and which the Defendants continue  to fail to render);

(c) the attestations, diagnosis, and reimbursement claims associated with a large number of Medicare and CHAMPUS eligible inpatients who were allegedly treated by Defendants during the period herein specified were predominantly false and fraudulent (and continue to be false and fraudulent) in that they were submitted in order to fraudulently obtain Federal Medicare and CHAMPUS payments for psychiatric services (including, but not limited to drug rehabilitation programs)  which were (and continue to be) rendered by persons who do not have the required licenses to provide such treatments and are not adequately supervised by licensed persons; and

(d) the Defendants fraudulently altered and submitted (and continue to fraudulently alter and submit) the altered and false patient records and other documents in order to justify or substantiate Medicare payments.

78. Thereafter, Defendant BHC acting through its officers, employees, and agents, and Defendant FORT LAUDERDALE HOSPITAL, and its employees presently unidentified, acting on behalf of Defendant BHC, would submit false and fraudulent claims for payment to the appropriate officers and/or employees of the United States Government pursuant to the Medicare and CHAMPUS programs.

79. Defendants BHC and/or FORT LAUDERDALE HOSPITAL received payments for these fraudulent claims. All monies received from the false claims were paid to and received by the Defendants BHC and FORT LAUDERDALE HOSPITAL and were deposited into the account of Defendants BHC and FORT LAUDERDALE HOSPITAL.

80. According to Relators' best estimate and based upon their investigation of these fraudulent acts by Defendants BHC and FORT LAUDERDALE HOSPITAL, these Defendants submitted a substantial number of false and/or fraudulent invoices for inpatient claims for reimbursement from the Medicare and CHAMPUS programs to the United States Government, its officers and/or employees. The Relators estimate that the number of false and/or fraudulent claims submitted Defendants for services allegedly rendered at FORT LAUDERDALE HOSPITAL probably exceeds 26,000 patient days and the overpayments are substantial. The Relators believe the Plaintiffs are entitled to a substantial award consisting of statutory fines and treble damages (i.e., three times the compensatory damages). The amount to be actually awarded will be established at trial.

81. Accordingly, Plaintiffs will show that Defendants BHC and FORT LAUDERDALE HOSPITAL through the acts of their officers, knowingly presented or caused

28

125.    In summary, a partial hospitalization program is paid for eligible costs incurred in treating patients who are eligible.   In other words, the program is designed to reimburse non-profit operators for all of their allowable costs incurred in treating Medicare eligible patients. These funds are paid by the United States Government through its Federal Medicare program and through federal contributions to the Medicaid program.  The amount of such payments to the program is partially determined by the physician's diagnosis of the patient, the services performed by the program, and the payor's identity.  The program is charged with the responsibility of assigning the correct codes for services performed.

126.    A partial hospitalization program ("PHP") is a program that is furnished by a hospital to its outpatients or by a Community Mental Health Center.  The purpose of admitting a patient to a PHP is to provide treatment in a less less expensive and restrictive setting than inpatient admission to persons who are at high risk of immediate onset of a serious condition that could imminently cause an inpatient admission.

127.    At all relevant times and continuing through the time of trial, FORT LAUDERDALE HOSPITAL operated one or more PHP Programs.

128.    At all relevant times and continuing through the time of trial, the patients' treatment plans would target the patients' primary diagnosis (e.g., depression) although FORT LAUDERDALE HOSPITAL knew that the patients' actual primary problem was drug or alcohol abuse.

129.    Beginning on or about March 18, 1998, and continuing through the time of trial, Defendant FORT LAUDERDALE HOSPITAL routinely admitted persons to its PHP and forensic units by Defendants PCHI, INTERPHASE, HUTTNER, and KONNEL, who had no qualifications for admission other than eligibility for payment by the Medicare Program. In order to efficiently fleece the Federal Programs, FORT LAUDERDALE HOSPITAL, by and

45

to be presented to an officer or employee of the United States Government a false or fraudulent claim for approval to the damage of the United States Treasury.

82.     Relators are further informed and believe that Defendants BHC and FORT LAUDERDALE HOSPITAL, submitted false and fraudulent information to the United States Government, through its Federal Medicare and CHAMPUS programs, in order to obtain payment for inpatients who resided at the hospital but were ineligible for such Federal Medicare or CHAMPUS benefits as described above. Relators are informed and believe that Defendants FORT LAUDERDALE HOSPITAL and BHC, falsified the invoices and other documents submitted to Medicare and CHAMPUS through the hospital's Fiscal Intermediary(s), to obtain payment for:

(a) treatments based upon fraudulent diagnosis;

(b) treatments which were not actually rendered ;

(c) treatments which were rendered but not by qualified personnel;

(d) test results that were not received until after patient was discharged;

(e) treatment for patients which could not be reasonably expected to benefit from such treatments; and

(f) a facility which did not provide adequate staff to meet the patients needs.

The result of submitting this fraudulent information resulted in overpayments to the hospital for all of its Medicare and CHAMPUS inpatient and outpatient claims. Thus, almost all of the claims for reimbursement for inpatient and outpatient psychiatric services submitted by the

1   Defendants for payment by the Federal Medicare and CHAMPUS programs were and continue

2   to be fraudulent.  These overpayments continue to be received by the Defendants.

3

4       83.   The Defendants have submitted thousands of false claims resulting in substantial

5   overpayments from the Federal Programs.  Defendants, and each of them sued in this cause of

6   action, submitted or caused to be submitted false and fraudulent claims and records, by the

7   means set forth below.

8

9       84.   Payment for psychiatric services is to made only for 'active treatment' which can

10  reasonably be expected to improve the patient's condition.  For services in a psychiatric

11  program to be designated as 'active treatment', they must be: (a) provided under an individual

12  treatment or diagnostic plan, (b) reasonably expected to improve the patient's condition or for

13  the purpose of diagnosis, and (c.) supervised and evaluated by a physician.

14

15  **ADDITIONAL ALLEGATIONS COMMON TO ALL PROGRAMS**

16  **AT FORT LAUDERDALE HOSPITAL**

17      85.  At all relevant times, Defendants FORT LAUDERDALE HOSPITAL and BHC

18  submitted claims which were false because the claims were not eligible for payment by the

19  Federal Programs.

20

21      86.   At all relevant times and continuing through the time of trial, FORT

22  LAUDERDALE HOSPITAL failed to provide adequate number of licensed psychotherapists

23  and the number of patients attending group therapy sessions often exceeded the maximum

24  number (i.e., ten) allowed by FORT LAUDERDALE HOSPITAL Medicare Intermediary,

25

26

27      87.  At all relevant times and continuing through the time of trial, FORT

28  LAUDERDALE HOSPITAL frequently admitted patients who had severe medical (non-

1   psychiatric) problems which rendered them inappropriate for admission to a non-medical,

2   (psychiatric) hospital.

3

4   88.   At all relevant times and continuing through the time of trial,  FORT

5   LAUDERDALE HOSPITAL frequently admitted patients who had admitted that the only illicit

6   drug that they used was "crack" or cocaine, thereby rendering such patients ineligible for

7   payment by the Medicare Program.  Despite the patients' ineligibility, FORT LAUDERDALE

8   HOSPITAL submitted claims and received payments for crack addicted, Federal beneficiaries.

9   For example, FORT LAUDERDALE HOSPITAL admitted patients including but not limited to

10   J.M., P.B. , A..C.

11

12   89.   At all relevant times and continuing through the time of trial, the patients' treatment

13   plans would target the patients' primary diagnosis (e.g., depression) although FORT

14   LAUDERDALE HOSPITAL knew that the patients' actual primary problem was drug or

15   alcohol abuse.

16

17   90.   At all relevant times and continuing through the time of trial, FORT

18   LAUDERDALE HOSPITAL, by and through its supervisory nurses authorized and, by and

19   through  CAROL CALDWELL (BHC's Vice President of Clinical Services) ratified, Licenced

20   Practical Nurses ("LPN's") in the Intensive Outpatient Unit and Pride Unit --- removing (i.e.,

21   receiving and transcribing) physicians' orders for medications in violation of the law.   Relator

22   SHOENFELT complained to CAROL CALDWELL and RACHEL ST. JOHN (an officer or

23   agent of BHC then also serving as FORT LAUDERDALE HOSPITAL's  Acting Director of

24   Nursing) but the problem continued unabated.

25

26   91.   At all relevant times and continuing through the time of trial,   FORT

27   LAUDERDALE HOSPITAL routinely failed to provide individualized treatment plans.

28   Treatment Plans were assigned from a "canned text" provided by DONNA PUTNAM.

92.   At all relevant times and continuing through the time of trial, defendant FORT LAUDERDALE HOSPITAL admitted patients who were not reasonably likely to benefit from treatment because these persons were recently been discharged from other out patient and inpatient programs (typically, SOUTHERN WINDS HOSPITAL) as recently as earlier on the day they were assessed for admission at BHC.  On some occasions, Relators CLARK and CHRISTIANSEN discovered that the prospective patient was recently discharged and successfully prevented some of these persons from being admitted.  For example, on or about March 16, 1998, SOUTHERN WINDS HOSPITAL  discharged Patient P.H. a few hours earlier and Dr. Cabada (P.H.'s attending physician at SOUTHERN WINDS) had provided P.H. with an after care plan for outpatient care only.   (Relator CHRISTENSEN called  BHC's so-called ethics hotline to report that GERBER, KONNELL, and HUTTNER are putting pressure on her (as well as other intake staff including Relator CLARK) and trying to make her commit Medicare fraud.  Despite Relators' allegations, BHC did not conduct an on-site "investigation" until on or about August, 1998.)

93.   At all relevant times and continuing through the time of trial, DR SEELY,  DR. PUNJWANI,, and COMPASS  routinely billed the Federal Programs for consultations/examinations which allegedly required 45 minutes or 15 minutes when, in fact, the consultations routinely lasted an average of five minutes or less and very rarely exceeded ten minutes.  The treatment provided at FORT LAUDERDALE HOSPITAL was not adequately supervised or rendered by physicians.  For example, at all relevant times until his termination on or about August, 1998, Defendant DR. SEELY , Defendant FORT LAUDERDALE HOSPITAL's  medical director (until on or about August, 1998), maintained extremely limited office hours (typically less than 8 hours per week)  and very rarely, if ever, consulted with patients under Relator's care or the care of other mental health counselors.  Beginning on or about August 1, 1998, FORT LAUDERDALE HOSPITAL appointed DR. PUNJWANI as Medical Director and DR. PUNJWANI similarly failed to adequately supervise patient treatment.

94.   FORT LAUDERDALE HOSPITAL, by and through DONNA PUTNAM, routinely falsified patients' primary diagnosis and directed other employees operating under her supervision and control to also falsify patient records in order to assure a diagnosis which the Federal Programs would pay for.

95.   At all relevant times,  FORT LAUDERDALE HOSPITAL instructed its employees to chart behavior according to the diagnosis and to not chart any patient behavior which was inconsistent with the purported diagnosis and/or which would render the patients ineligible for reimbursement by the Federal Programs

### FORT LAUDERDALE HOSPITAL'S THIRD FLOOR (RAPID STABILIZATION UNIT)

96.   At all relevant times and continuing through the time of trial,  FORT LAUDERDALE HOSPITAL routinely submitted claims for payment by the Federal Programs although these claims were not eligible for payment because, inter alia, Defendants BHC and FORT LAUDERDALE HOSPITAL:

(A).   Failed to conduct one-to-one watches (i.e., constant observation of one patient by a health care employee)  and falsely recorded that such watches were performed on : (1) On September 30, 1998, FORT LAUDERDALE HOSPITAL directed Relator CONNOLLY to chart one-to-ones on patient B. C.  and Patient M. [LNU]; (2) On September 29, 1998, FORT LAUDERDALE HOSPITAL directed Relator CONNOLLY to chart one-to-ones on patient B.C. and Patient R. [LNU]; (3) On September 28, 1998, FORT LAUDERDALE HOSPITAL directed Relator CONNOLLY to chart one-to-ones on patient B.C. and Patient M. [LNU]; (4) On September 22, 1998, FORT LAUDERDALE HOSPITAL directed Relator CONNOLLY to chart one-to-ones on patient M. [LNU]  while supposedly providing direct contact for three other patients Patients A. [LNU],

1                D. {LNU] and C. [LNU].

2

3      (B).   Routinely admitted and re-admitted patients to  FORT LAUDERDALE

4            HOSPITAL to the Rapid Stabilization Unit ("RSU") without medical necessary

5            or reasonable under the circumstances.  For example, FORT LADUDERDALE

6            HOSPITAL 's  RSU admitted Patient C.T. on or about February 5, 1998,

7            continuing until February 11, 1998.  FORT LAUDERDALE HOSPITAL

8            admitted Patient C.T. to its Forensic Unit on April 26, 1998, through May 5,

9            1998, and re-admitted this patient to the Forensic Unit on June 13, 1998, through

10          June 24, 1998.

11

12     (C).   Routinely treated patients' so-called secondary diagnosis (frequently drug,

13         including crack addiction) rather than the primary diagnoses;

14

15     (D)   Routinely assigned falsified diagnosis to the patients in order to receive payment

16         from the Federal Programs.

17

18                       **FORENSIC UNIT**

19

20     97.     Beginning on or about March 18, 1998, and continuing through the time of trial,

21  Defendants PHCI, CONTINUED CARE, and/or INTERPHASE  and/or its officers and agents,

22  including, GOLDSTEIN, HUTNER, and KONNELL,  gave bribes and other remunerations to

23  doctors, hospitals, clinics, group homes,  and other sources of patient  referrals to encourage

24  them to refer or direct patients to BHC/FORT LAUDERDALE HOSPITAL.   These bribes,

25  kickbacks, and remunerations, included but were not limited to the following:

26

27          A.   A purported "salary" of sixty thousand dollars ($60,000) per month paid by

28            BHC to HUTTNER (and/or a management fee paid to PHCI);

B.   A "finders fee" paid by defendant HUTTNER and/or BHC for each patient that defendant KONNELL referred who was subsequently admitted to BHC;

C.   Free services, *inter alia*, the "housing" or "holding" of "patients" at BHC until defendants PHCI, CONTINUED CARE, INTERPHASE, GOLDSTEIN, HUTNER, and/or KONNELL had other facilities available to admit such persons;

D.   Housing patients without charge or at reduced charge for HUTTNER, GOLDSTEIN, KONNELL, PCHI, INTERPHASE, and/or their affiliates for their convenience and/or to prevent the patient from being referred to an out patient home which was not affiliated with HUTTNER, GOLDSTEIN, KONNELL, PCHIINTERPHASE, or CONTINUED CARE.

E.   Provided free transportation for residents referred by HUTTNER, GOLDSTEIN, KONNELL, PCHI, INTERPHASE, and/or CONTINUED CARE even when such transportation would not be furnished to other residents.

98.   Beginning on or about March 18, 1998, and continuing through the time of trial, patients referred by HUTTNER, KONNELL, PHCI, INTERPHASE, and/or CONTINUED CARE, were also admitted to other units of FORT LAUDERDALE HOSPITAL including, the PHP Program, and, especially beginning on or about September, 1998, (when defendants closed the Forensic Unit) to all other units of FORT LAUDERDALE HOSPITAL.

99.     Beginning on or about March 18, 1998, and continuing until on or about September, 1998, the parties' profit motivation and consequential bookkeeping burden were greatly simplified by requiring all persons referred by PHCI, KONNELL, and/or HUTNER to be housed in BHC/FORT LAUDERDALE HOSPITAL's Forensic Unit (on the fifth floor) regardless of the person's psychiatric condition (if any) unless the Forensic Unit was already full and then such referrals were admitted to other units of FORT LAUDERDALE HOSPITAL. Some of the referrals were admitted directly to FORT LAUDERDALE HOSPITAL/PHCI's PHP Program because they were not then eligible for Medicare payment s for inpatient treatment. .

100.    In the alternative, BHC  submitted  claims to the Federal Programs  for treatment which BHC neither  administered nor rendered by concealing that  PHCI had performed the treatment (or failed to provide such treatment at BHC's FORT LAUDERDALE HOSPITAL) , made the decision to admit the patient(s), and/or paid remuneration to the referral source (thereby violating the Stark Act.)

## PARTICIPATION BY AGENTS OR RECIPIENTS OF KICKBACKS

101.    Beginning on a date as yet unknown to Relators but known to defendants, Defendants INTERPHASE, PHCI, GOLDSTEIN, KONNELL, and HUTTNER,  solicited persons who were Medicare and/or Medicaid beneficiaries residing outside the State of Florida including, but not limited to, Alabama, Georgia, New Jersey, New York, and North Carolina to come to south Florida in order to enroll in their program(s).  Relators are informed and believe and based thereon allege that these defendants received kickbacks for referring such patients to mental health care providers and facilities.  Beginning on or about March 18, 1998, and continuing through the time of trial, these defendants began referring patients to FORT LAUDERDALE HOSPITAL.

102.   Relators are informed and believe and based thereon allege that many of these PHP patients were admitted to Defendants FORT LAUDERDALE HOSPITAL, SOUTHERN WINDS, THE RETREAT, and, possibly THE COVE and/or INTERPHASE, and these admissions were routinely made  without valid physician's orders and/or an actual physician's assessment.

### FORT LAUDERDALE HOSPITAL'S FORENSICS UNIT "CUSTODY RELEASE" PROGRAM

103.   Beginning on or about March 18, 1998, and continuing until September, 1998, FORT LAUDERDALE HOSPITAL accepted many persons with a history of violent crime into its newly opened,  so-called  Forensic Unit without providing adequate supervision and security to assure patient safety in the Forensic Unit and for the patient population in all other units as well.

104.   BHC and FORT LAUDERDALE HOSPITAL by and through GERBER knew or recklessly disregarded that KONNELL frequently told its hospital staff and patients that patients were admitted as "court ordered" rather than as "custody releases."

105.   FORT LAUDERDALE HOSPITAL detained "patients" after these persons demanded that FORT LAUDERDALE HOSPITAL return them to jail.

106.   FORT LAUDERDALE HOSPITAL's officers, employees and agents often falsified testimony in order to obtain civil commitment orders (a/k/a "Baker Act") in order to continue to detain Medicare beneficiaries at FORT LAUDERDALE HOSPITAL.

107.   FORT LAUDERDALE HOSPITAL by and through officers employees and/or agents as whose identify is yet unknown to Relators, provided controlled substances to patients in order to induce the patients to remain in FORT LAUDERDALE HOSPITAL's treatment

programs.

108.   Some of the patients admitted to the Forensic Unit suffered from cognitive problems or disabilities which prevented the patient benefitting from psychological treatment.

109.   Beginning on or about March 18, 1998, and continuing through the time of trial, Defendant FORT LAUDERDALE HOSPITAL routinely represented to the Florida Department of Corrections and counties (i.e., Dade and Broward Counties) that FORT LAUDERDALE HOSPITAL is a "secured, locked, 100-bed psychiatric treatment facility."

110.   Many of the patients referred by Defendants HUTTNER, KONNELL, PCHI, CONTINUED CARE, to FORT LAUDERDALE HOSPITAL were on "custody release" from Broward County Jail. Defendants accepted many persons convicted of violent felony crimes (up to and including homicide) many of whom were active prisoners of the State of Florida (or incarcerated in the County Jail due to insufficient prison space).  Defendants often housed these patients in the Forensic Unit, where many nonviolent persons were detained, and were allowed to intermingle with the general patient population for approximately two hours per day with only minimal supervision/observation.

110 (A).  FORT LAUDERDALE HOSPITAL admitted Patient W.M. on several occasions, including: (1) April 8, 1998, through April 15, 1998; (2) May 19, 1998, through May 28, 1998; (3) June 20, 1998, through June 30, 1998; and (4) July 11, 1998, through July 14, 1998.   Patient W.M. refused to attend groups and refused to get out of bed except for meals and cigarette breaks.

110 (B).  FORT LAUDERDALE HOSPITAL admitted Patient F.G. on or about May 5, 1998, on custody release  from the Dade County Jail System (where he was incarcerated for assault and battery against a woman.)  While on the Forensic Unit, F.G. expressed

38

violent intentions but was supervised so inadequately that he managed to crudely converse with the adolescent females.  Patient F.G. demanded to be returned to jail but, instead, defendants had Patient F.G. involuntarily admitted under the Baker Act. Patient F.G. was Baker Acted and, subsequently, constantly so heavily sedated that Dr. Seely admitted that his medication was "at near toxic levels."   Despite the threat to patient and employee safety and, ultimately, to the Patient's life, FORT LAUDERDALE HOSPITAL detained Patient F.G. until June 5, 1998.

110 (C).  FORT LAUDERDALE HOSPITAL admitted Patient T.P. on or about April 30, 1998, and continued to house this patient until May 11, 1998.  Patient T.P. refused to participate in treatment and refused to leave his room except for meals and cigarette breaks.

110 (D).  FORT LAUDERDALE HOSPITAL admitted Patient  F.P. on or about April 30, 1998, and continued to house this patient until May 18, 1998.   Patient F.P. was seldom cognizant of his surroundings, was disruptive or non-participating

110 (E)    FORT LAUDERDALE HOSPITAL and Dr. SEELY admitted patient K.G. on or about April 1, 1998, as a "custody release" although defendant's records indicate that Patient K.G. was recently discharged from SOUTHERN WINDS HOSPITAL. Nevertheless, FORT LAUDERDALE HOSPITAL housed Patient K.G. in its Forensic Unit  for twenty days (until on or about April 21, 1998 despite Patient's poor participation in group therapy, combativeness, assaults against staff, poor hygiene and other behavior indicating that Patient was not benefitting from the purported "treatment" and indicating a cognitive disorder.  FORT LAUDERDALE HOSPITAL allowed patient K.G. to intermingle with the general patient population including adolescent girls. FORT LAUDERDALE HOSPITAL readmitted Patient K.G. on or about June 23, 1998, through on or about July 15, 1998.

39

110 (F).   On or about June 30, 1998, through on or about July 27, 1998, FORT LAUDERDALE HOSPITAL acquired Patient C.K. through the custody release program.   Patient C.K. had a history of violent crime (kidnaping, aggravated assault with a knife, and other significant crimes).  Patient C.K. was very disruptive in groups and presented a danger to patients (especially adolescent and adult females) and staff (especially, but not limited to, females).   FORT LAUDERDALE HOSPITAL allowed Patient C.K. to intermingle with the general patient population (along with as many as sixteen other Forensic Unit patients) with only one mental health technician to monitor these patients.

110 (G)  On or  about July 1,  1998, FORT LAUDERDALE HOSPITAL, by and through its agents, INTERPHASE, PHCI, HUTTNER, and KONNEL,  decided to readmit Patient R.L.  without any clinical information (i.e., no presenting problem(s), medical history, or admitting diagnosis).      Relators are informed and believe that this patient was readmitted to Fort Lauderdale Hospital on or about July 1, 1998.

110 (F).   FORT LAUDERDALE HOSPITAL and Dr. SEELY admitted Patient O.D. to its Forensic Unit on six occasions: (1) March 1, 1998, through March 10, 1998; (2) March 31, 1998, through April 16, 1998; (3) June 21, 1998, through June 23, 1998; (4) July 15, 1998, through July 20, 1998; (5) July 23, 1998, through July 29, 1998; (6) August 7, 1998, through August 31, 1998.

111.   The threat to safety presented by these patients were so unsafe that physicians, employees, and agents feared for their safety including: (1) Dr. MORALES, who refused to enter the Forensic Unit, especially when Patients F.G. and C.K. were admitted; and (2) KONNEL who refused to enter the Forensic Unit when Patient R.L. was admitted.

112.   Despite the danger presented to patients and staff, FORT LAUDERDALE

HOSPITAL routinely failed to conduct close watches (a/k/a "Q-15's") and falsely recorded the close watches on all of such patients while they were intermingling with patients from other units, visitors, and employees, in elevators, the cafeteria, and/or taking cigarette breaks in an outdoor "cage." Furthermore, FORT LAUDERDALE HOSPITAL failed to provide adequate facilities and staffing for this inmate population.

113. Beginning on or about June, 1998, and continuing until September, 1998, (when the Forensic Unit closed), Relator D'ANDREA repeatedly objected to DONNA PUTNAM, the Program Director of FORT LAUDERDALE HOSPITAL's Forensic Unit, DONNA PUTNAM, and objected to or reported her concerns about fraud in the Forensic Unit (especially that patients' behavior did not evidence the admitting diagnosis) without appropriate follow-up and/or corrective action. DONNA PUTNAM directed Relator D'ANDREA to document and report patients' condition according to the diagnosis (or words to that effect).

114. On or about September, 1998, Relator D'ANDREA informed CAROL CALDWELL, BHC's officer (Vice President Clinical Services) and FORT LAUDERDALE HOSPTIAL's then-current acting Director of Nursing, that Relator was concerned about defendant's practices on the Forensic Unit. Despite CALDWELL's actual knowledge of other allegations of fraud and participation on BHC's so-called compliance team, CALDWELL never discussed or responded to Relator's invitation to interview her until BHC's officer, RACHEL ST. JOHN, terminated Relator's employment approximately three weeks later.

115. Despite the danger presented to patients, medical staff, and employees and Defendants BHC and FORT LAUDERDALE HOSPITAL's actual knowledge of these unsafe conditions, Defendants agravated these dangerous conditions by closing the so called "Forensic Unit" during September, 1998, but continued to admit the so called "custody release" patients to other units of the hospital thereby placing these patients with the hospital's general

41

population 24 hours a day;

## FORT LAUDERDALE HOSPITAL'S
## SECOND FLOOR (OPEN ADULT UNIT)

116.    At all relevant times and continuing through the time of trial, FORT LAUDERDALE HOSPITAL submitted false and fraudulent claims for patients admitted to the Open Adult Unit.

117.    DR SEELY, DR. PUNJWANI, and COMPASS routinely billed the Federal Programs (e.g., Medicare Part "B") for patients admitted to, *inter alia*, FORT LAUDERDALE HOSPITAL's Open Adult Unit for purported psychiatric treatment although most of the medication provided was appropriate for drug/alcohol detoxification programs and the counseling provided, if any, was for drug and alcohol dependency.

118.    DR SEELY, DR. PUNJWANI, and COMPASS routinely billed the Federal Programs (e.g., Medicare Part "B") for patients admitted to FORT LAUDERDALE HOSPITAL for purported psychiatric treatment although these physicians and their practice group knew or recklessly disregarded that  the vast majority of these patients had been treated for drug or alcohol addiction for years (often under the admitting physician's care).

119.    DR SEELY,  DR. PUNJWANI,, and COMPASS  routinely billed the Federal Programs for consultations/examinations which allegedly required 45 minutes or 15 minutes when, in fact, the consultations routinely lasted an average of five minutes or less and very rarely exceeded ten minutes.

120.    At all relevant times and continuing through the time of trial,   FORT LAUDERDALE HOSPITAL frequently billed the Federal Programs for inpatient admissions

for patients who refused or were unable to attend therapy. For example, patient E.T. admitted on or about April 13, 1998, through on or about May 29, 1998, and was subsequently readmitted on or about June 30, 1998, through on or about July 16, 1998, or a total of sixty-two (62) days.

121.   At all relevant times and continuing through the time of trial, FORT LAUDERDALE HOSPITAL frequently dispensed excessive levels of medications including controlled substances especially to voluntary patients on the Open Adult Unit in order to induce such patients to remain in the hospital for treatment.

122.   At all relevant times and continuing through the time of trial, FORT LAUDERDALE HOSPITAL and the STAFF PHYSICIANS routinely falsified primary axis diagnosis to indicate a diagnosis that was eligible for Medicare reimbursement and falsely stated that the patients' secondary axis (or problem) was drug or alcohol addiction.

123.   At all relevant times and continuing through the time of trial, FORT LAUDERDALE HOSPITAL and the STAFF PHYSICIANS frequently dispensed excessive levels of medications, including controlled substances.

124.   At all relevant times and continuing through the time of trial, FORT LAUDERDALE HOSPITAL and the STAFF PHYSICIANS frequently ordered medications appropriate for treating drug or alcohol addiction rather than the patients' primary diagnosis.

124 (A).   At all relevant times and continuing through the time of trial, FORT LAUDERDALE HOSPITAL admitted a few psychiatric patients (as compared to drug/chemical addiction and/or dual diagnosis) but failed to provide treatment for the patients' psychiatric condition.

124 (B).   At all relevant times and continuing through the time of trial, Relators are informed and believe and based thereon allege that    FORT LAUDERDALE HOSPITAL's Open Adult Unit conducted groups using  counselors who did not have the licenses  required in order to receive Medicare payments for the groups but submitted claims and received payments for such services.

124(C)   At all relevant times and continuing through the time of trial,  FORT LAUDERDALE HOSPITAL including, *inter alia,* the hospital's  Open Adult Unit routinely facilitated  group therapy sessions for up to approximately twenty (20) patients at a time using only one so-called "counselor."

124 (D).  At all relevant times and continuing through the time of trial,  FORT LAUDERDALE HOSPITAL frequently failed to obtain patient's written acknowledgment of attendance as required for Medicare payment.

124 (E). At all relevant times and continuing through the time of trial, FORT LAUDERDALE HOSPITAL's counselors, including but not limited to PATTY SHERMAN, TONY D'MARTINO, PAUL ADAMS, SCOTT GELLER,  routinely failed to document any individualized record of patient participation.  FORT LAUDERDALE HOSPITAL and BHC submitted claims and received funds from the Federal Programs.        On or about March, 1998,  BHC's officers, employees, and/or agents (WILLIAM NOLAN, RACHEL ST. JOHN, NEIL CURRY, and another person whose identity is presently unknown to Relators but is known to Defendants) knew that these claims were ineligible for payment and retained the funds received without notifying the Federal Programs.

**FORT LAUDERDALE HOSPITAL'S PARTIAL HOSPITALIZATION PROGRAM**

through GERBER, instructed hospital employees, including Relators CHRISTENSEN and CLARK, to verify Medicare coverage and remaining days of inpatient eligibility without requiring PCHI, INTERPHASE, HUTTNER, and KONNELL to provide any descriptive or clinical information.

## FORT LAUDERDALE HOSPITAL'S PARTIAL HOSPITALIZATION PROGRAM

130.   FORT LAUDERDALE HOSPITAL seldom if ever provided PHP patients one-on-one consultations with staff therapists until on or about September 1, 1998, when FORT LAUDERDALE HOSPITAL's psychotherapists began meeting with some of the PHP patients weekly.

131 .   Beginning on or about March 18, 1998, and continuing through the time of trial, FORT LAUDERDALE HOSPITAL's PHP program admitted many patients who were medically inappropriate for its PHP program: These patients include, but are not limited to:

131 (A).  Patient D.B. admitted on or about 1998, although patient exhibited symptoms of brain damage;

131 (B). Patient E.J. admitted on or about 1998, although patient exhibited substantial cognitive impairment and/or mental retardation; did not understand his reason for being in PHP and had no goals of participation;

131 (C).  Patient J.E. admitted on or about 1998, was medically inappropriate for the PHP Unit because he suffered from 3+ Edema, had difficulty in his lungs, and needed a pacemaker.  Furthermore, Patient J.E. refused to participate in some groups, refused to attend other groups, and was often disruptive.

131 (D).  Patient E.J. admitted on or about 1998, although  Patient did not comply with medication prescriptions, was  cognitively impaired and did not comprehend his therapy or reasons for being admitted.

132.  FORT LAUDERDALE HOSPITAL detained many patients (including but not limited to the patients identified below)  for longer than was medically appropriate (if at all) because the patients failed to participate in therapy and/or comply attendance requirements:

132 (A).  Patient M.F. admitted on or about April 27, 19998, and was absent April 28, 29, and 30th, 1998.  (Relators are informed and believe that failure of a patient to attend PHP for three consecutive days requires patient discharge and renders the beneficiary ineligible for payment.

132 (B).   Patient L.C. admitted on or about March 17, 1998, and failed to attend on April 6 through April 9, 1998, and should have been discharged immediately.

132 (C).  Patient M.G. admitted on about 1998, who was argumentative and belligerent towards patients and staff during groups, refused to comply with PHP dress code, and attended but did not participate in groups (towards his treatment goals).

133.  Beginning on or about March 18, 1998, FORT LAUDERDALE HOSPITAL's officers or agents (including but not limited to KONNELL) began "coaching," instructing and/or threatening persons to lie in order to gain admissions to FORT LAUDERDALE HOSPITAL.  Such outpatients include, but not limited to:

133 (A).  Patient A.C., admitted on or about March, 1998,  although patient admitted he was coached to say he was depressed in order to receive housing and

47

food.

133 (B).   Patient S.R. admitted although, on or about March 18, 1998, Relator CHRISTENSEN informed GERBER and HUTTNER  that S.R. informed staff that "Sam [KONNELL] said to tell you I was suicidal.  He said to say I severely depressed and violent but I wasn't comfortable about lying about this."   Patient S.R. also explained that KONNELL "threatened me with jail if I did not come here."

133 (C).    Persons admitted to the Forensic Unit would routinely ask  "did I do good?" (or words to that effect) or state "Sam said  to tell you" (or words to that effect) or "I have to come here so I don't go to jail" (or words to that effect).

133 (D).    Other persons informed FORT LAUDERDALE HOSPITAL that they were homeless and needed to be admitted in order to obtain food and shelter.

134.   Other patients were inappropriate for admission to or continuing treatment at FORT LAUDERDALE HOSPITAL's PHP Program because FORT LAUDERDALE HOSPITAL's PHP Program did not offer counseling or therapy for their psychological condition including but not limited to:

134 (A).  Patient HH admitted on or about July 6, 1998, through on or about August 3, 1998, for treatment for depression although the patient suffered from severe anorexia. Furthermore, BHC failed to take and/or analyze patient's EKG results to clear the severely anorexic patient for discharge.

134 (B).   Other patients were inappropriate for admission to or continuing treatment at

FORT LAUDERDALE HOSPITAL's PHP Program because they presented a threat to the health and/or safety of others.  Examples of such patients include:

134 (C).   On or about  1998, FORT LAUDERDALE HOSPITAL admitted Patient J.M. to its PHP program although Patient J.M. suffered from multiple personality disordered and frequently dissociated into alter ego Paco, a gang member who terrorized group therapy sessions and hallways.  Furthermore,Patient  J.M. who never bathed, refused to see the doctors and smelled of feces.

134 (D). On or about 1998, FORT LAUDERDALE HOSPITAL admitted  a male exhibitionist who frequently masturbated in the transport van in front of female sexual trauma victims.

134 (E) On or about  1998, FORT LAUDERDALE HOSPITAL admitted Patient M.H., a delusional psychotic who was a danger to other persons and should not have been admitted to a PHP Unit.

135.   Other patients were medically inappropriate  for a PHP program but met the criteria for inpatient status. Nevertheless, FORT LAUDERDALE HOSPITAL and PHCI/INTERHASE kept these patients on a PHP basis.  Such patients include, but are not limited to:

135 (A).   Patient M.H.  (admitted in 1998) who was delusional (e.g., stating that he was a Medicare Investigator) and required restraint by at least 8 male employees on the date he was admitted.

136.   Beginning on or about March 18, 1998, FORT LAUDERDALE HOSPITAL

officer, employees and/or agents including, but not limited to: NICOLE NICASTRO,,

STANLEY PAYLEY and two therapists known to Relators as Bill [LNU] and David [LNU],

began maintaining a blackboard showing preplanned discharge dates for each patient.  These

discharge dates were (usually) 30 days after admission and were posted without doctor's

direction.

137.   Patient DT admitted on or about July 15, 1998, by  BREKKA, KONNELL, and

employee(s) of FORT LAUDERDALE HOSPITAL's business office who are as    yet unknown

to Relators, after an assessment by Relator CHRISTENSEN  indicated no basis for admitting

this patient.  Patient DT further told CHRISTENSEN that KONNELL  instructed to lie in

order to be admitted to FORT LAUDERDALE HOSPITAL.  Relator  CHRISTENSEN

recommended that D.T. was not appropriate for admission  to Fort Lauderdale Hospital.  Fort

Lauderdale Hospital  through BREKKA and KONNELL, attempted to intimidate

CHRISTENSEN.   KONNELL attempted to  justify his attempts to admit D.T. to Fort

Lauderdale Hospital's Forensic Unit because she was homeless.  BREKKA ordered

CHRISTENSEN to allow KONNELL to speak to the prospective patient D.T.    After this

conversation, D.T. suddenly began to portray symptoms of  delusional behavior in order to be

admitted.  BREKKA told Relator CHRISTENSEN "Now you can admit [D.T.],  after speaking

to Sam [KONNELL], she is delusional" (or  words to that effect).   Relator CHRISTENSEN

refused to recommend that Fort Lauderdale Hospital admit D.T. and  wrote a report complaining

about this incident.   Despite   Relator CHRISTENSEN's complaint, BHC and FORT

LAUDERDALE HOSPITAL ignored or disregarded  CHRISTENSEN's complaint.

138.   Many  patients were rapidly and almost continuously readmitted in a rabid attempt

to syphon off Medicare funds for the beneficiaries eligibility for in patient treatment and, upon

exhaustion of such benefits, eligibility for out patient (e.g., PHP program) benefits.  Despite

staff complaints that many patients were being admitted against their will, instructed to lie, were

inappropriate for admission, or did not evidence any behavior supporting  inpatient status,

defendants BHC, FORT LAUDERDALE HOSPITAL and PHCI/INTERHASE /CONTINUED CARE and DR. SEELY, DR. PUNJWANI, and COMPASS, frequently readmitted these patients despite lack of improvement.   Such patients include, but are not limited to:

138 (A).   Patient J.C., admitted seven (7) times: (1) beginning on or about March 1, 1998, through March 10, 1998 (9 days); (2) March 31, 1998, through April 16, 1998, (16 days); (3) June 21, 1998, through June 23, 1998, (3 days); (4) July 15, 1998, through July 20, 1998, (6 days); (5) July 23, 1998, through July 29, 1998, (6 days); (6) August 7, 1998, through August 13, 1998, (6 days); and (7) September 27, 1998, through October [date presently unknown], 1998.  These admissions to FORT LAUDERDALE HOSPITAL total at least fifty-eight (58) days;

138 (B).   At all relevant times, DR. SEELY failed to see his patients weekly (as required by Medicare) and, often, delegated the psychological evaluation to a nurse.  Relators are informed and believe that DR SEELY applied for and received payments fro m the Federal Programs for such patients.

139.   FORT LAUDERDALE HOSPITAL by and through NICOLE NICASTRO, its Director the PHP Program, routinely failed to conduct weekly treatment meetings beginning on or about March, 1998, and are informed and believe that FORT LAUDERDALE HOSPITAL's failure to conduct weekly treatment team meetings continues through the present time and  the time of trial.

140.   FORT LAUDERDALE HOSPITAL's non-physician employees decide whether to discharge patients without  consulting with the physician. FORT LAUDERDALE HOSPITAL, DR. SEELY,

141.   FORT LAUDERDALE HOSPITAL, by and through its supervisory nurses, directed mental health technicians to complete discharge forms (including medications to take after discharge).   Relator SHOENFELT filed one or more incident report(s) complaining that this conduct was illegal (or words to that effect) but the problem continued. without corrective action.

142.   At all relevant times, FORT LAUDERDALE HOSPITAL allowed unlicenced and/or uncredentialed persons to provide psychotherapy sessions to patients in the PHP Unit. FORT LAUDERDALE HOSPITAL, by and through its agent NICOLE NICASTRO (PHP Unit Director) fraudulently made entries in patient records that she had attended and supervised the psychotherapy sessions.   Relator SHOENFELT complained to BHC officers including CAROL CALDWELL  (BHC's attorney) who did nothing.

143.   FORT LAUDERDALE HOSPITAL and the STAFF PHYSICIANS provide inadequate supervision of patients.  For example, during DR. SEELY's employment at FORT LAUDERDALE HOSPITAL, DR. SEELY attended approximately two (2) treatment team meetings in the PHP.

144.  FORT LAUDERDALE HOSPITAL and the Defendant Staff Physicians failed to provide PHP patients with adequate after care upon and following patients' release from its PHP program.

145.  FORT LAUDERDALE HOSPITAL, STAFF PHYSICIANS, including, but not limited to DR. SEELY, and employees, including, but not limited to NICOLE NICASTRO, provide prescription drug samples from a cache in NICASTRO NICASTRO's office in FORT LAUDERDALE HOSPITAL although she is not licensed to dispense medication.

145 (A).   Relators are informed and believe and based on them allege that FORT

52

1  LAUDERDALE HOSPITAL employees, including, but not limited to, NICOLE

2  NICASTRO, (FORT LAUDERDALE HOSPITAL's Director of the PHP Program)

3  dispensed Wellbutrin, Paxil, Remeron, Zoloft, Buspar,  and other drugs to patients

4  including H.N., C.E., and B.C., without prescription.

5

6  145 (B). On numerous occasions, the patients' actual behavior did not resemble the

7  descriptions charted by employees of FORT LAUDERDALE HOSPITAL.

8

9  145 (C).  Beginning on or about 1996,  BHC and/or FORT LAUDERDALE

10  HOSPITAL employees

11

12  146.  At all times relevant through the time of trial,  FORT LAUDERDALE

13  HOSPTIAL's officers  instructed employees to record only specified behaviors in patient

14  records and prohibited employees from using terms which would render the patient ineligible

15  for payment and/or continuing stay.

16

17  147.  Defendants BHC and FORT LAUDERDALE HOSPITAL continued to admit

18  patients owned or detained by PHCI, INTERPHASE, HUTTNER, KONNELL, and

19  GOLDSTEIN after FORT LAUDERDALE HOSPITAL Admitting & Receiving Staff,

20  including but not limited to Relators CHRISTIANSEN and CLARK, notified officers,

21  employees and agents of defendant BHC and/or FORT LAUDERDALE HOSPITAL, including

22  but not limited to:

23

24  (A)  MICHAEL GERBER   (Administrator of FORT LAUDERDALE HOSPITAL);

25  (B)  NICOLE NICASTRO (Director of FORT LAUDERDALE HOSPITAL's PHP

26  Program);

27  (C).  DONNA PUTNAM

28

1  despite knowing that such prospective patients did not meet criteria for admission to FORT

2  LAUDERDALE HOSPITAL.  Many of these patients were subsequently admitted by other

3  admitting and receiving employees (other than Relators CHRISTIANSEN and CLARK) on

4  shifts when Relators were not on duty; Relators are informed and believe that many of the these

5  so-called "patients" were admitted to SOUTHERN WINDS HOSPITAL and THE RETREAT.

6  Relators CHRISTIANSEN and CLARK complained on numerous occasions to the afore

7  described officers that numerous patients told FORT LAUDERDALE HOSPITAL's employees

8  that patients referred by PHCI, CONTINUED CARE,  and/or INTERPHASE told them that

9  KONNELL told these patients to tell hospital staff things that the patients knew were not true in

10  order to be admitted to FORT LAUDERDALE HOSPITAL.  BHC and FORT LAUDERDALE

11  HOSPITAL's officers responded by belittling or ridiculing such employee complaints and

12  continued their improper admission practices.  On or about November 18, 1998, defendant

13  FORT LAUDERDALE HOSPITAL finally stopped admitting patients referred directly by

14  KONNELL but did not terminate its contract with PCHI.

15

16      148.    After numerous objections against fraud by the  Relators, BHC's officers,

17  employees, and/or agents, including RACHEL ST. JOHN,  WILLIAM NOLAN, and/or other

18  persons whose identity is as yet unknown to Relators,  conducted an "audit" which, based upon

19  information and belief, identified at least fifty (50) patients who were ineligible for

20  reimbursement from the Federal Programs.   Despite acquiring actual knowledge of the false

21  and fraudulent claims, defendants BHC and FORT LAUDERDALE HOSPITAL retained the

22  federal funds received and failed to notify the Federal Programs that they were entitled to

23  reimbursement.

24

25      149.    Defendants BHC and FORT LAUDERDALE HOSPITAL, by and through their

26  officers, employees, and agents, further falsified the then-existing medical records of former

27  patients of FORT LAUDERDALE HOSPITAL in order to conceal the fact that defendants were

28  not eligible to receive reimbursement from the Federal Programs for "treating" these patients.

## RESIDENTIAL PSYCHIATRIC PROGRAMS OTHER THAN BHC:
## and THREE QUARTER WAY HOUSES

150.    Relators are informed and believe and based thereon allege that  Defendants INTERPHASE,  PHCI  and/or their officers and agents, including, GOLDSTEIN, HUTTNER, and KONNELL,  gave bribes and other remunerations to doctors, hospitals, clinics,  and other sources of patient referrals to induce  them to refer or direct patients to CHANGING TIMES, THE COVE,  FIRST STEP,  FOUNDATIONS,  and other facilities and programs whose identity is currently unknown to Relators but is known by the defendants.    These bribes, kickbacks, and remunerations were evidenced by:

A.    BHC's instructions to Relators and other BHC employees to not allow any person "owned" or referred by defendants PHCI, INTERPHASE, CONTINUED CARE  KONNELL, or HUTTNER, to leave FORT LAUDERDALE HOSPITAL if  FORT LAUDERDALE HOSPITAL did not admit them;

B.    FORT LAUDERDALE HOSPITAL's  and BHC's payment of renumeration to PHCI,  KONNELL, and/or HUTTNER for patient referrals;

C.    The refusal by INTERPHASE, PHCI, KONNELL, and HUTTNER to refer patients to FORT LAUDERDALE HOSPITAL until BHC and/or FORT LAUDERDALE  HOSPITAL agreed to pay bribes, kickbacks or other remuneration to these defendants;

D.    Statements by HUTTNER, CHRIS BECKA, and/or other officers, employees,  or agents of INTERPHASE, PHCI,  and/or CONTINUED CARE  that KONNELL (or his affiliates) received a kickback or payment for each patient admitted to FORT LAUDERDALE HOSPITAL (or words to that effect).

55

E.    Statements by HUTTNER and KONNELL that they were also acting on behalf of INTERPHASE and CONTINUED CARE.

F.    Statements by HUTTNER, KONNELL, and/or BREKKA, that HUTTNER, INTERPHASE, PCHI, and/or CONTINUED CARE own, control, or operate other programs including THE COVE, CHANGING TIMES, and FIRST STEP.

G.    Statements by HUTTNER and KONNELL that they THE RETREAT would accept patients rejected by Relators CHRISTIANSEN and CLARK and other hospital employees because the prospective patients were inappropriate;

H.    Documents provided to Relators by HUTTNER stating that INTERPHASE was a "network" of "treatment programs" for the dually diagnosed.

I.    Employees of FIRST STEP, THE COVE, and CHANGING TIMES, frequently threatened to report Relators CHRISTIANSEN and CLARK and other employees of FORT LAUDERDALE HOSPITAL, to HUTTNER, KONNELL, and GERBER, for denying their residents admission to FORT LAUDERDALE HOSPITAL;

J.    A document distributed by MARK EHRENSHAFT to all FORT LAUDERDALE employees identifying "Associated Business with Jonathan Huttner" including THE COVE, FIRST STEP, CHANGING TIMES and ten additional programs including Phoenix Program, Safe Passage Program, Florida Behavioral Health, Efaro Behavioral Health, Caring Center, Metro Dade Center, Partners Program, Sandalfoot Program, Utopia Half Way House, Remy Half Way House.

K.    FORT LAUDERDALE HOSPITAL by and through GERBER, KONNELL,

HUTTNER, ERINSHAFT, BREKKA, PUTNAM, NICASTRO, D'MARTINO, and other officers and employees, instructed Relators and other employees to discharge patients who were referred to FORT LAUDERDALE HOSPITAL by PCHI, INTERPHASE, HUTTNER or KONNELL only to facilities who PCHI, INTERPHASE, HUTTNER and/or KONNELL choose regardless of patients' express complaints and stated desire.

L.   Observations by Relators of Defendants' referral patterns to and from FORT LAUDERDALE HOSPITAL evidencing that these defendants frequently received referrals from INTERPHASE, PHCI, HUTTNER, KONNELL of patients controlled by this group.

M.   Instructions by BHC/FORT LAUDERDALE HOSPITAL's officers to Relators and other employees to not release any person referred by INTERPHASE, PHCI, HUTNER, or KONNELL from FORT LAUDERDALE HOSPITAL until KONNELL   HUTNER, and/or other employees of PHCI or INTERPHASE  picked up the patients.

N.   BHC and FORT LAUDERDALE HOSPITAL, by and through GERBER, (their facility administrator) instructed employees to place all persons from KONNELL, HUTTNER, and/or PHCI in the Forensic Unit regardless of patients mental condition or treatment needs. KONNELL, GERBER, CHRIS BREKKA, MARK EHRENSHAFT, and NICOLE NICASTRO explained that this was required in order to assure that referral sources "received credit" for their referrals.

O.   BHC and FORT LAUDERDALE HOSPITAL's offers of money or property to employees, including Relator CHRISTENSEN, in order to induce employees to

cease objecting to fraud on the Medicare Program;

P.     BHC and FORT LAUDERDALE  HOSPITAL, by and through GERBER, instructed the Admitting and Receiving employees to NOT ask KONNELL, HUTTNER, or PHCI for clinical information prior to verifying candidates' Medicare eligibility and number of remaining days of Medicare eligibility for inpatient care.

Q.     BHC and FORT LAUDERDALE HOSPITAL, by and through GERBER, BREKNA, NICASTOR, PUTNAM, ERENSHAFT, HUTTNER, and KONNELL pressured, verbally abused, harassed, intimidated, cursed at and threatened FORT LAUDERDALE HOSPITAL Employees including, but not limited to Relators CHRISTIANSEN and CLARK if they did not admit certain patients who where known to be inappropriate (including patients who had been readmitted several times without evidencing improvement);

R.    FORT LAUDERDALE HOSPITAL, by and through GERBER, HUTTNER, NICASTRO, EHRENSHAFT, BREKKA,  and KONNELL instructed Relators CHRISTIANSEN and CLARK to assign all patients referred by HUTTNER, KONNELL, PCHI, INTERPHASE, THE COVE, CHANGING TIMES,  FIRST STEP, and FOUNDATIONS to DR. SEELY and, beginning on or about September, 1998, to DR PUNJWANI.

S.    The lucrative amount of the spoils  to be gained from controlling the referrals of the residents;

T.    Employees and officers of Three Quarter Way Houses who insisted that their residents be admitted and/or threats to turn FORT LAUDERDALE HOSPITAL

employees in to HUTTNER; and

U.   Offers of money or property made by defendants to Relator CHRISTENSEN after she called BHC's corporate compliance "hot line".

151.   On or about July, 1998, Relator CASSIS complained to GERBER that FORT LAUDERDALE HOSPITAL's PHP patients were not provided medications and/or were not capable of self administering medications and were not provided adequate medical supervision by many of the THREE QUARTER WAY HOUSES  (I.e., FIRST STEP, FOUNDATIONS and THE COVE) . Relator CASSIS described the need for discharge planning and patients' right to chose placement.   GERBER responded that this was good for business because it would cause the patients to be readmitted to FORT LAUDERDALE HOSPITAL.   Relator SHOENFELT informed NICASTRO (Director of the hospital's PHP Program) expressed similar concerns. Despite Relators' complaints, FORT LAUDERDALE HOSPITAL continued to deny patients their right to chose alternative placement and forced all patients to return to inadequate facilities affiliated with the HUTTNER, KONNELL and their affiliates.

152. Relators are informed and believe that the 3/4 WAY HOUSES warehouse people typically by forcing up to four men to a bedroom in a  men to share a two bedroom   apartment (or eight persons sharing a two bedroom apartment).  Relators are informed and believe and based thereon allege that this overcrowding and vermin infested housing violated local ordinances.   These residents were often involved in drugs, prostitution and other illegal activities on premises of their group homes.

153.   Relators are informed and believe and based thereon allege  that these patients did not receive adequate  medical care (including a routine  lack of medication administration leading to frequent decompensation) and were inadequately supervised.

### OTHER ALLEGATIONS:

154.   Relators are informed and believe and based thereon allege that each of the patients referenced in this complaint were beneficiaries of the Medicare, Medicaid, CHAMPUS, TRICARE, SLIAG, and/or FEHB Programs.  Other patients were covered beneficiaries of Federal Programs because they were members of the FLORIDA SEMINOLE TRIBE .

155.   Thereafter, Defendants BHC, FORT LAUDERDALE HOSPITAL, the STAFF PHYSICIANS, COMPASS, INTERPHASE, PCHI, CONTINUED CARE, SOUTHERN WINDS, and THE RETREAT  and other  employees presently unidentified, acting on behalf of these Defendants, would submit false and fraudulent claims for payment to the appropriate officers and/or employees of the United States Government pursuant to the Medicare and Medicaid  programs.  All monies received from the false claims were paid to and received by the  Defendants were deposited to their accounts or accounts of their officers, agents, directors, shareholders or medical directors.

156.   According to Relators' best estimate and based upon his investigation of these fraudulent acts by Defendants BHC, FORT LAUDERDALE HOSPITAL, the STAFF PHYSICIANS, COMPASS, INTERPHASE, PCHI, CONTINUED CARE and THE RETREAT, these Defendants submitted a substantial number of false and/or fraudulent invoices for outpatient claims for reimbursement from the Medicare and Medicaid  programs to the United States Government, its officers and/or employees.   The Relators believe  that the United States of America is entitled to a substantial award consisting of a statutory fines and treble damages.

157.   Accordingly, Plaintiff will show that Defendant COMPASS, SEGAL, PUNJWANI, and SEELY,  through the acts of their officers,   knowingly presented or caused to be presented to an officer or employee of the United States Government a false or fraudulent claim for approval to the damage of the United States Treasury.

158.   Relators are informed and believe and, therefore, allege that the aforesaid acts have been undertaken by Defendants PHCI, GOLDSTEIN, HUTNER, KONNELL, since at least March 17, 1994, and continue through the time of trial.

159.   Relators are informed and believe and based thereon allege that the afore described acts have been undertaken by Defendants BHC, GERBER, SEELY, PUTNAM, NICASTRO, DR. SEELY, DR. PUNJWANI, DR. SEGAL, and COMPASS, since at least on or about M arch 7, 1998, and continuing through the time of trial.

160.   Relators are informed and believe and based thereon allege that the afore described acts have been undertaken by Defendants CHANGING TIMES, THE COVE, FIRST STEP, THE FOUNDATION, THE RETREAT, and SOUTHERN WINDS HOSPITAL, since on or about November 1, 1992, and continuing through the time of trial.

## FIRST CAUSE OF ACTION

161.   Plaintiffs hereby reallege and incorporate paragraphs 1 - 160 as if fully set forth herein.

162.   Beginning on dates known to the Defendants but unknown to the Relators and continuing through the time of trial, Defendants knowingly, or in reckless disregard of the truth, presented false claims to the United States by submitting, for Federal Program beneficiaries, requests for payment for the provision of psychological services (e.g., inpatient hospitalization, group homes, etc.) and physician services that they knew were ineligible for reimbursement.

163.   Defendants knowingly presented or caused to be presented to an officer or employee of the United States government false or fraudulent claims for approval to the damage of the United States.

1     164.   By virtue of this scheme, Defendants defrauded the United States and the

2    Federal Programs of an amount substantially exceeding one million dollars.

3

4                   **SECOND CAUSE OF ACTION**

5

6     165.   Relator repeats and repleads and incorporates by reference each and every one of

7    the allegations contained in paragraphs 1- 160, inclusive, and Paragraph 162-164 of the First

8    Cause of Action as though fully set forth herein.

9

10     166.  In performing the acts herein above alleged Defendants, and each of them,

11   knowingly made, used, or caused to be made or used, a false record or statement to get a false or

12   fraudulent claim paid or approved by the Government to the damage of the Treasury of the

13   United States.

14

15                  **THIRD CAUSE OF ACTION**
                **WRONGFUL DISCHARGE - CLARK**

16     167.   Relator Clark realleges and incorporates by reference paragraphs 7 and 13-14,

17   66-156, 162-3, and 166 of this  Complaint as though fully set forth herein.

18

19     168.   This Court has subject matter jurisdiction pursuant to 28 U.S.C.  1331 and 31

20   U.S.C. § 3730(h).

21

22     169.   This is an action against Behavioral Healthcare Corporation, Behavioral

23   Healthcare Corporation of Delaware, Inc.  BHC Fort Lauderdale Hospital, Inc., d/b/a Fort

24   Lauderdale Hospital and Fort Lauderdale Hospital Management, LLC.  At the time of the

25   retaliatory discharge, the Relator was employed by BHC Fort Lauderdale Hospital, Inc.  d/b/a

26   Fort Lauderdale Hospital.  Upon information and belief, its parent company was Behavioral

27   Healthcare Corporation and/or Behavioral Healthcare Corporation of Delaware, Inc. On or

28   about July 31, 1999, Fort Lauderdale Hospital Management, LLC, acquired BHC Fort

Lauderdale Hospital, Inc., d/b/a Fort Lauderdale Hospital, including its assets and liabilities.

170.    In or about 1998, Relator Clark was engaged in lawful conduct in furtherance of an action to be filed under the Federal Civil False Claims Act.

171.    Relator Clark complained to his supervisors about the false claims being committed as described hereinabove.

172.    In the fall of 1998, Relator was discharged from his employment by Defendant as a result of his lawful acts in furtherance of an action under this section, 31 U.S.C. § 3730 (h) including investigation for an action under this section.  Defendant knew that Relator Clark was engaged in this protected activity, to wit, investigation of false billing, had in fact specifically complained to Defendants and their agents, both in writing and orally, and wrongfully discharged Relator Clark because of that activity.

173.    As a direct and proximate result of Defendant's unlawful discharge in violation of 31 U.S.C. § 3730 (h), Relator has suffered serious economic hardship, including lost wages and special damages associated with his efforts to obtain alternative employment, in an amount to be proved at trial.

174.    That relator be awarded all relief necessary to make him whole including, but not limited to, two times his back pay and other compensatory damages sustained by reason of Defendant's discrimination and retaliation.

## FOURTH CAUSE OF ACTION
## WRONGFUL DISCHARGE -CASSIS

175.    Relator Cassis realleges and incorporates by reference paragraphs 9 and 13-14,

1   66-156, 162-3, and 166 of this  Complaint as though fully set forth herein. This Court has

2   subject matter jurisdiction pursuant to 28 U.S.C.   1331 and 31 U.S.C. § 3730(h).

3

4        176.    This is an action against Behavioral Healthcare Corporation, Behavioral

5   Healthcare Corporation of Delaware, Inc.  BHC Fort Lauderdale Hospital, Inc., d/b/a Fort

6   Lauderdale Hospital and Fort Lauderdale Hospital Management, LLC.  At the time of the

7   retaliatory discharge, the Relator was employed by BHC Fort Lauderdale Hospital, Inc.  d/b/a

8   Fort Lauderdale Hospital.  Upon information and belief, its parent company was Behavioral

9   Healthcare Corporation and/or Behavioral Healthcare Corporation of Delaware, Inc. On or

10  about July 31, 1999, Fort Lauderdale Hospital Management, LLC, acquired BHC Fort

11  Lauderdale Hospital, Inc., d/b/a Fort Lauderdale Hospital, including its assets and liabilities.

12

13       177.    In or about 1998, Relator Cassis was engaged in lawful conduct in furtherance of

14  an action to be filed under the Federal Civil False Claims Act.

15       178.    Relator Cassis complained to his supervisors about the false claims being

16  committed as described hereinabove.

17       179.    In the Fall of 1998, Relator was discharged from his employment by Defendant

18  as a result of his lawful acts in furtherance of an action under this section, 31 U.S.C. § 3730 (h)

19  including investigation for an action under this section.  Defendant knew that Relator Cassis

20  was engaged in this protected activity, to wit, investigation of false billing, had in fact

21  specifically complained to Defendant both in writing and orally, and wrongfully discharged

22  Relator Cassis because of that activity.

23

24       180.    As a direct and proximate result of Defendant's unlawful discharge in violation

25  of 31 U.S.C. § 3730 (h), Relator has suffered serious economic hardship, including lost wages

26  and special damages associated with his efforts to obtain alternative employment, in an amount

27  to be proved at trial.

28

181.    That relator be awarded all relief necessary to make him whole including, but not limited to, two times his back pay and other compensatory damages sustained by reason of Defendant's discrimination and retaliation.

## FIFTH CAUSE OF ACTION
### WRONGFUL DISCHARGE -CHRISTENSEN

182.    Relator Christensen realleges and incorporates by reference paragraphs 6 and 13-14, 66-156, 162-3 and 166 of this Complaint as though fully set forth herein. This Court has subject matter jurisdiction pursuant to 28 U.S.C.   1331 and 31 U.S.C. § 3730(h).

183.    This is an action against Behavioral Healthcare Corporation, Behavioral Healthcare Corporation of Delaware, Inc.  BHC Fort Lauderdale Hospital, Inc., d/b/a Fort Lauderdale Hospital and Fort Lauderdale Hospital Management, LLC.  At the time of the retaliatory discharge, the Relator was employed by BHC Fort Lauderdale Hospital, Inc.  d/b/a Fort Lauderdale Hospital.  Upon information and belief, its parent company was Behavioral Healthcare Corporation and/or Behavioral Healthcare Corporation of Delaware, Inc. On or about July 31, 1999, Fort Lauderdale Hospital Management, LLC, acquired BHC Fort Lauderdale Hospital, Inc., d/b/a Fort Lauderdale Hospital, including its assets and liabilities.

184.    In or about 1998, Relator Christensen was engaged in lawful conduct in furtherance of an action to be filed under the Federal Civil False Claims Act.

185.    Relator Christensen complained to her supervisors about the false claims being committed as described hereinabove.

186.    In the Fall of 1998, Relator was discharged from her employment by Defendant as a result of her lawful acts in furtherance of an action under this section, 31 U.S.C. § 3730 (h) including investigation for an action under this section.  Defendant knew that Relator

Christensen was engaged in this protected activity, to wit, investigation of false billing, had in fact specifically complained to Defendant both in writing and orally, and wrongfully discharged Relator Christensen because of that activity.

187.    As a direct and proximate result of Defendant's unlawful discharge in violation of 31 U.S.C. § 3730 (h), Relator has suffered serious economic hardship, including lost wages and special damages associated with her efforts to obtain alternative employment, in an amount to be proved at trial.

188.    That relator be awarded all relief necessary to make her whole including, but not limited to, two times her back pay and other compensatory damages sustained by reason of Defendant's discrimination and retaliation.


## SIXTH CAUSE OF ACTION
## WRONGFUL DISCHARGE -D'ANDREA

189.    Relator D'Andrea realleges and incorporates by reference paragraphs 11 and 13-14, 66-156, 162-3 and 166 of this Complaint as though fully set forth herein. This Court has subject matter jurisdiction pursuant to 28 U.S.C.   1331 and 31 U.S.C. § 3730(h).

190.    This is an action against Behavioral Healthcare Corporation, Behavioral Healthcare Corporation of Delaware, Inc.  BHC Fort Lauderdale Hospital, Inc., d/b/a Fort Lauderdale Hospital and Fort Lauderdale Hospital Management, LLC.  At the time of the retaliatory discharge, the Relator was employed by BHC Fort Lauderdale Hospital, Inc.  d/b/a Fort Lauderdale Hospital.  Upon information and belief, its parent company was Behavioral Healthcare Corporation and/or Behavioral Healthcare Corporation of Delaware, Inc. On or about July 31, 1999, Fort Lauderdale Hospital Management, LLC, acquired BHC Fort

Lauderdale Hospital, Inc., d/b/a Fort Lauderdale Hospital, including its assets and liabilities.

191.    In or about 1998, Relator D'Andrea was engaged in lawful conduct in furtherance of an action to be filed under the Federal Civil False Claims Act.

192.    Relator D'Andrea complained to her supervisors about the false claims being committed as described hereinabove.

193.    In the Fall of 1998, Relator was discharged from her employment by Defendant as a result of her lawful acts in furtherance of an action under this section, 31 U.S.C. § 3730 (h) including investigation for an action under this section.  Defendant knew that Relator D'Andrea was engaged in this protected activity, to wit, investigation of false billing, had in fact specifically complained to Defendant both in writing and orally, and wrongfully discharged Relator D'Andrea  because of that activity.

194.    As a direct and proximate result of Defendant's unlawful discharge in violation of 31 U.S.C. § 3730 (h), Relator has suffered serious economic hardship, including lost wages and special damages associated with her efforts to obtain alternative employment, in an amount to be proved at trial.

195.    That relator be awarded all relief necessary to make her whole including, but not limited to, two times her back pay and other compensatory damages sustained by reason of Defendant's discrimination and retaliation.

### SEVENTH CAUSE OF ACTION
### WRONGFUL DISCHARGE -CONNOLLY

196.    Relator Connolly realleges and incorporates by reference paragraphs 12, and 13-14, 66-156, 162-3, and 166 of this Complaint as though fully set forth herein. This Court has subject matter jurisdiction pursuant to 28 U.S.C.   1331 and 31 U.S.C. § 3730(h).

197.     This is an action against Behavioral Healthcare Corporation, Behavioral Healthcare Corporation of Delaware, Inc.  BHC Fort Lauderdale Hospital, Inc., d/b/a Fort Lauderdale Hospital and Fort Lauderdale Hospital Management, LLC.  At the time of the retaliatory discharge, the Relator was employed by BHC Fort Lauderdale Hospital, Inc.  d/b/a Fort Lauderdale Hospital.  Upon information and belief, its parent company was Behavioral Healthcare Corporation and/or Behavioral Healthcare Corporation of Delaware, Inc. On or about July 31, 1999, Fort Lauderdale Hospital Management, LLC, acquired BHC Fort Lauderdale Hospital, Inc., d/b/a Fort Lauderdale Hospital, including its assets and liabilities.

198.     In or about 1998, Relator Connolly was engaged in lawful conduct in furtherance of an action to be filed under the Federal Civil False Claims Act.

199.     Relator Connolly complained to his supervisors about the false claims being committed as described hereinabove.

200.     In the Fall of 1998, Relator was discharged from his employment by Defendant as a result of his lawful acts in furtherance of an action under this section, 31 U.S.C. § 3730 (h) including investigation for an action under this section.  Defendant knew that Relator Connolly was engaged in this protected activity, to wit, investigation of false billing, had in fact specifically complained to Defendant both in writing and orally, and wrongfully discharged Relator Connolly because of that activity.

201.     As a direct and proximate result of Defendant's unlawful discharge in violation of 31 U.S.C. § 3730 (h), Relator has suffered serious economic hardship, including lost wages and special damages associated with his efforts to obtain alternative employment, in an amount to be proved at trial.

202.     That relator be awarded all relief necessary to make him whole including, but not limited to, two times his back pay and other compensatory damages sustained by reason of Defendant's discrimination and retaliation.

# PRAYER FOR RELIEF

1.      Judgment against the Defendants in an amount equal to three times the damages sustained by the United States as a result of Defendants' conduct;

2.      A civil penalty of not less than five thousand dollars ($5,000.00) and not more than ten thousand dollars ($10,000.00) for each violation of 31 U.S.C. § 3729;

3.      That Relators, as Qui Tam Plaintiffs, be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d) and/or any other applicable provision of law;

4.      Attorney's fees and costs pursuant to 31 U.S.C. § 3730 (d)(1) according to proof;

5.      That relators be awarded all relief they are entitled to under 31 U.S.C. §3730(h), as a result of the Defendant's discrimination and retaliation.

## For All Causes of Action

1.      For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relators demand a trial by jury for all issues so triable.

RESPECTFULLY SUBMITTED this 10th day of July, 2000.

1

2

## __CERTIFICATION__

3

4        I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this

5 _10th_ day of July, 2000 to: Lisa Barquist, Assistant United States Attorney, 99 NE 4th Street

6 Miami, FL 33132.

7

8                                          _____
                                           **Kenneth J. Nolan, Esq.**
9                                          Kenneth J. Nolan, P.A.
                                           350 E. Las Olas Blvd., Suite 1270
10                                         Fort Lauderdale, FL 33301
                                           Telephone (954) 929-4850
11                                         Fax: (954) 929-6603

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JS 44
(Revised ...)

**98-3021**     **CIVIL COVER SHEET**     **CV-SEITZ**

MAGISTRATE
BANDSTRA

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

United States of America ex rel. Deborah Louise Christensen, Benjamin Clark, Jimmy Cassis, Dulce Marie Bustamante, Reba E. Shoenfelt, Carlese Abrielle D'Andrea and James Robert Connolly

**DEFENDANTS** Preferred Healthcare Consultants, Inc., Compass Health Systems, P.A., Behavioral Healthcare Corporation of Delaware, Behavioral Healthcare Corporation, et.al.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

1:98 CV 3021-PAS/TEB

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Dade
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Donald E. Petersen
P.O. Box 1948
Orlando, FL 32802
(407) 648-9050

ATTORNEYS (IF KNOWN)

Action Arose in Dade County

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

[X] 1 U.S. Government Plaintiff
[ ] 2 U.S. Government Defendant
[ ] 3 Federal Question (U.S. Government Not a Party)
[ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business in This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Qui Tam action brought pursuant to 31 U.S.C. 3729 et. seq. concerning fraud against Medicare and other healthcare programs.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury— Med Malpractice | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 365 Personal Injury— Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 | | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 450 Commerce/ICC Rates/etc. |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 650 Airline Regs | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud | [ ] 660 Occupational Safety/Health | [ ] 840 Trademark | [ ] 810 Selective Service |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 690 Other | **SOCIAL SECURITY** | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | **LABOR** | [ ] 861 HIA (1395ff) | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 710 Fair Labor Standards Act | [ ] 862 Black Lung (923) | [ ] 891 Agricultural Acts |
| [ ] 195 Contract Product Liability | | | [ ] 720 Labor/Mgmt. Relations | [ ] 863 DIWC/DIWW (405(g)) | [ ] 892 Economic Stabilization Act |
| | | | [ ] 730 Labor/Mgmt. Reporting & Disclosure Act | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 740 Railway Labor Act | [ ] 865 RSI (405(g)) | [ ] 894 Energy Allocation Act |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate Sentence | [ ] 790 Other Labor Litigation | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | Habeas Corpus: | [ ] 791 Empl. Ret. Inc. Security Act | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | | | [X] 890 Other Statutory Actions |
| [ ] 245 Tort Product Liability | [ ] 440 Other Civil Rights | [ ] 540 Mandamus & Other | | | |
| [ ] 290 All Other Real Property | | [ ] 550 Other | | | |

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

[X] 1 Original Proceeding
[ ] 2 Removed from State Court
[ ] 3 Remanded from Appellate Court
[ ] 4 Reinstated or Reopened
[ ] 5 Transferred from another district (specify)
[ ] 6 Multidistrict Litigation
[ ] 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
[ ] UNDER F.R.C.P. 23

**DEMAND $**

Check YES only if demanded in complaint
JURY DEMAND: [X] YES [ ] NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

N/A    JUDGE _____    DOCKET NUMBER _____

DATE   December 7, 1998

SIGNATURE OF ATTORNEY OF RECORD   Saul Smoler

UNITED STATES DISTRICT COURT

515196 - $150.00    12-10-98